**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | **FOR PUBLICATION** |
| KG WINDDOWN, LLC, *et al.*,[1] | Chapter 11 |
| Debtors. | Case No. 20-11723 (MG) |
| | (Jointly Administered) |
| BSP Agency LLC, Providence Debt Fund III L.P., Benefit Street Partners SMA-C L.P., Benefit Street Partners SMA LM L.P., Providence Debt Fund III Master (Non-US) Fund L.P., Benefit Street Partners SMA-C SPV L.P., Manager IM Rest, LLC, 60th Street IM Rest, LLC, Asset Co IM Rest, LLC, Atlantic City IM Rest, LLC, Boca IM Rest, LLC, Franchise IM Rest, LLC, Gram Trib IM Rest, LLC, Long Island Opco IM Rest, LLC, Long Island Propco IM Rest, LLC, Miami IM Rest, LLC, Products IM Rest, LLC, Soho Prime IM Rest, LLC, Central IM Rest, LLC, and Receivables IM Rest, LLC, | Adv. Pro. No. 21-01006 (MG) |
| Plaintiffs, | |
| v. | |
| Gerald Katzoff, GFB Restaurant Corp., IM LLC-I, and I M LLC-II, | |
| Defendants. | |

## OPINION AFTER TRIAL

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number (if any), include: KG Winddown, LLC (8556); KG USA Winddown, LLC (1682); KG III Winddown, LLC (2613); KG LV Winddown, LLC (9805); KG Florida Winddown, LLC (9385); KG Puerto Rico Winddown, LLC (0901); KG AC Winddown, LLC (5082); KG Products Winddown, LLC (0303); KG LI Restaurant Group Winddown, LLC (1623); KG LI Winddown, LLC (1488); KG Franchise Winddown, LLC (0565); KG 60th St Holdings Winddown, LLC (9997); KG Broadway Winddown, LLC (4335); KG Hamptons Winddown, LLC (0423) and KG Payroll Winddown, LLC (0807).  For the purpose of these chapter 11 cases, the service address for the Debtors is: 12 Penns Trail, Suite 125, Newton, PA 18940.

*A P P E A R A N C E S:*

QUINN EMANUEL URQUHART & SULLIVAN, LLP
*Counsel to the Plaintiffs*
51 Madison Avenue
New York, NY 10010
By:     Rachel Epstein, Esq.
        Benjamin Finestone, Esq.
        Mario O. Gazzola, Esq.
        Donald John Reinhard, II, Esq.
        Zachary R. Russell, Esq.

MARKS & KLEIN, LLP
*Counsel to the Defendants*
63 Riverside Avenue
7th Floor
Red Bank, NJ 07601
By:     Brent M. Davis, Esq.
        Justin M. Klein, Esq.

WESTERMAN BALL EDERER MILLER ZUCKER & SHARFSTEIN, LLP
*Counsel to Defendants Gerald Katzoff and GFB Restaurant Corp.*
1201 RXR Plaza
Uniondale, NY 11556
By:     William C. Heuer, Esq.

# Table of Contents

I.  BACKGROUND ........................................................................................................................ 3

    A.  Il Mulino's Founding ................................................................................................ 3

    B.  Mr. Katzoff and His Business Partners Acquire Il Mulino ...................................... 4

    C.  The GFB License ....................................................................................................... 4

    D.  The IM-III License ................................................................................................... 6

    E.  Sublicenses from IM USA ........................................................................................ 8

    F.  IM USA Enters into a Credit Agreement with BSP ................................................. 8

    G.  The Debtors Encounter Financial Distress and Prepare for Bankruptcy ............... 9

    H.  The Debtors Enter Bankruptcy and Sell Substantially All Assets to Plaintiffs .... 10

    I.  The Post-Closing Letters ........................................................................................ 10

    J.  The Adversary Proceeding ..................................................................................... 11

II.  COUNT I: VIOLATION OF THE CRO ORDER .............................................................. 13

III.  COUNT II: VIOLATION OF THE SALE ORDER ........................................................... 15

    A.  The Post-Closing Letters Violated the Sale Order ................................................ 15

    B.  The Plaintiffs Are Not Entitled to Attorneys' Fees for Mr. Katzoff's Violation of the Sale Order ................... 16

IV.  COUNT III: DECLARATION OF DOMAIN NAME RIGHTS ....................................... 20

V.  COUNT IV: BREACH OF THE IM-III LICENSE ............................................................ 23

    A.  Whether Extrinsic Evidence May Be Considered in Interpreting the Licenses ..... 23

    B.  The Original Parties' Intent Should Be Considered in Interpreting the Licenses .. 24

    C.  The Licenses Can Coexist Without Conflict ........................................................... 24

        1.  Scope of Exclusivity ......................................................................................... 24

        2.  The "Restaurants" in the IM-III License ......................................................... 25

        3.  The Territorial Restriction in the GFB License ............................................... 28

        4.  Domain Names .................................................................................................. 30

5.    *Sharing the Use of the Domain Names* ........................................................... *32*

D.    THE PLAINTIFFS' CLAIMS FOR BREACH OF THE IM-III LICENSE FAIL ...............................34

1.    *Grant and Continuation of the Original GFB License* ........................... *35*

2.    *Representation and Warranty Regarding Prior Licenses* ....................... *36*

3.    *Extensions and Amendments to the GFB License* ................................. *36*

4.    *Refusal to Cooperate with Prosecution of an Infringement Claim* .......... *39*

5.    *Anticipatory Breach by the Post-Closing Letters* ................................. *40*

E.    PLAINTIFFS HAVE NOT PROVEN ANY DAMAGES .............................................40

F.    AN INJUNCTION IS NOT WARRANTED .........................................................43

G.    PRIOR NOTICE OF THE GFB LICENSE ..........................................................47

VI.    **COUNT V: INFRINGEMENT** ...............................................................................**49**

VII.    **COUNT VI: FRAUDULENT TRANSFER UNDER N.Y. D.C.L. §§ 273, 274, AND 276** ......................**49**

VIII.    **COUNT VII: FRAUDULENT TRANSFER UNDER 11 U.S.C. §§ 544, 548, AND 550** ..........................**52**

IX.    **COUNT VIII: TORTIOUS INTERFERENCE WITH CONTRACT** ..........................................**55**

A.    NEW YORK'S STRANGER RULE ..................................................................56

1.    *Mr. Katzoff* ............................................................................... *58*

2.    *GFB* ........................................................................................ *61*

B.    DAMAGES .........................................................................................63

X.    **COUNT IX: FRAUD** ........................................................................................**64**

XI.    **COUNT X: BREACH OF FIDUCIARY DUTY** ..............................................................**64**

XII.    **DEFENDANTS' COUNTERCLAIMS** ......................................................................**71**

A.    COUNTERCLAIM FOR A DECLARATION THAT THE GFB LICENSE IS VALID ..............................71

B.    COUNTERCLAIM FOR BREACH OF SECTION 3.1.1 OF THE IM-III LICENSE ...........................71

XIII.    **CONCLUSION** .............................................................................................**75**

**MARTIN GLENN**
**UNITED STATES BANKRUPTCY JUDGE**

This opinion decides issues of fact and law following trial of this adversary proceeding.

BSP[2] was the pre-petition secured creditor of the chapter 11 debtors, and acquired the debtors'

assets with a credit bid in a section 363 sale.  Among the valuable assets acquired was a license

of a tradename, trademark, and related intellectual property.  But precisely what license rights

were acquired under the asset purchase agreement and sale order is very much in dispute.  Both

sides seek a declaration of their rights, and the Plaintiffs also seek damages and injunctive relief

against at least some of the Defendants on a variety of legal theories.

The disputes stem from two licenses that grant "exclusive" rights to two different parties.

The first is the license dated September 23, 2002, between defendant IM LLC-I ("IM-I") and

defendant GFB Restaurant Corp. ("GFB").  ("GFB License," ECF Doc. # 35-1; Pls. Ex. 6.)  GFB

owns and operates the "original" Il Mulino Italian restaurant in New York City.  The second is

the license dated March 5, 2004, between IM-I and IM LLC-III ("IM-III").  ("IM-III License,"

ECF Doc. # 6-3; Pls. Ex. 18.)[3]  The IM-III License was assigned to debtor Il Mulino USA, LLC

("IM USA") the same day as it was executed (March 5, 2004).  (Pls. Ex. 18 at 13–16.)

The IM-III License was among the assets acquired by the Plaintiffs in the section 363

sale.  After the section 363 sale, the Plaintiffs own and operate *other* Il Mulino restaurants, some

in New York City and some elsewhere.

---

[2]    The BSP entities are BSP Agency LLC, Providence Debt Fund III L.P., Benefit Street Partners SMA-C
L.P., Benefit Street Partners SMA LM L.P., Providence Debt Fund III Master (Non-US) Fund L.P., and Benefit
Street Partners SMA-C SPV L.P. (collectively, "BSP").  The other Plaintiffs (Manager IM Rest, LLC, 60th Street
IM Rest, LLC, Asset Co IM Rest, LLC, Atlantic City IM Rest, LLC, Boca IM Rest, LLC, Franchise IM Rest, LLC,
Gram Trib IM Rest, LLC, Long Island Opco IM Rest, LLC, Long Island Propco IM Rest, LLC, Miami IM Rest,
LLC, Products IM Rest, LLC, Soho Prime IM Rest, LLC, Central IM Rest, LLC, and Receivables IM Rest, LLC)
were BSP's designees under the Asset Purchase Agreement.

[3]    In addition to the "IM-III License," the parties have, at times, referred to this license as the "IM-I License"
and the "IM USA License."  Each of those terms refers to the same license.

But what rights does each license grant?  As part of an uneasy truce on negotiated terms set forth in a stipulation and order dated February 5, 2021 (the "Stipulation," ECF Doc. # 24), GFB and BSP currently "share" (i) the "Il Mulino" tradename for their respective restaurants, (ii) a common website accessed using the "ilmulino.com" domain name, and (iii) use of the "ilmulino.com" domain name as part of their email addresses.

The central issue is whether the GFB License and the IM-III License conflict, or whether they can coexist.  For the reasons explained below, the Court finds that the licenses do not conflict with each other, and the licenses can coexist.  While the Court also finds that IM-I breached the IM-III License, the Plaintiffs are entitled to only nominal damages.

With respect to the Plaintiffs' other claims, the Court concludes that (1) certain post-closing letters from Defendants' counsel did not violate the CRO Order entered on August 14, 2020,[4] but did violate the Sale Order entered on December 22, 2020[5] (but the Plaintiffs are not entitled to attorneys' fees), and (2) the Plaintiffs' claims for fraudulent transfer, tortious interference, and breach of fiduciary duty all fail.  The Court also concludes that the Plaintiffs should not be granted injunctive relief.

With respect to the Defendants' counterclaims against the Plaintiffs, the Court finds and concludes that the Defendants are entitled to a declaration that the GFB License is valid and can coexist with the IM-III License, but they are not entitled to a declaration that the IM-III License is void.

---

[4]      Stipulation and Order Approving Chief Restructuring Officer and Establishing Operating Protocol for the Debtors entered on August 14, 2020 (the "CRO Order," ECF Doc. # 6-12; Case No. 20-11723, ECF Doc. # 60).

[5]      Order (I) Approving Asset Purchase Agreement Among Sellers and Buyer, (II) Authorizing Sale of Substantially All of the Debtors Assets Free and Clear of Liens, Claims, Interests, and Encumbrances, (III) Authorizing Assumption and Assignment of Certain Executory Contracts and Leases in Connection Therewith, and (IV) Granting Related Relief (the "Sale Order," ECF Doc. # 6-13; Case No. 20-11723, ECF Doc. # 392).

2

# I.  **BACKGROUND**[6]

The Plaintiffs are the buyers and designees of substantially all of Debtors' assets in a section 363 sale.  (*See* Sale Order.)

The Defendants are Gerald Katzoff and three entities he controls: GFB, IM-I, and IM LLC-II ("IM-II").  Defendants GFB, IM-I, and IM-II were not debtors in the bankruptcy case.[7] Mr. Katzoff was the manager of the Debtors and was in control of the Debtors until this Court appointed Mackinac Partners, LLC, as chief restructuring officer ("CRO").  *See In re K.G. IM, LLC*, 620 B.R. 469 (Bankr. S.D.N.Y. 2020).  Craig Boucher performed the duties of CRO on behalf of Mackinac.

The dispute concerns the scope of the intellectual property rights that the Plaintiffs acquired in the section 363 sale.  The Plaintiffs describe those rights as "[t]he most valuable asset Plaintiffs acquired from the Debtors."  ("Pls. Br.," ECF Doc. # 74, at 11.)[8]

## A.  **Il Mulino's Founding**

In 1981, brothers Giovanni and Fernando Masci founded the original Il Mulino restaurant on West 3rd Street (the "Original Restaurant") in the Greenwich Village neighborhood of Manhattan.  ("Stipulated Facts," ECF Doc. # 78 Ex. A, ¶ 1.)  Giovanni and Fernando Masci owned the Original Restaurant through their company GFB.  (*Id.* ¶ 2.)  Since its founding in

---

[6]    On June 15, 2021, the Court entered a joint pretrial order (the "Joint Pretrial Order," ECF Doc. # 78) setting forth stipulated facts, the parties' contentions, the issues to be tried, lists of the Plaintiffs' and Defendants' exhibits, the witness lists, and the relief sought.  The Joint Pretrial Order supersedes the parties' prior pleadings.  Only those issues identified in the Joint Pretrial Order were tried by the Court.  This opinion sets forth the Court's findings of fact pursuant to Fed. R. Bankr. P. 7052, incorporating Fed. R. Civ. P. 52.  Based on the Court's opportunity to judge witness credibility, the opinion includes the Court's determinations of disputed issues of fact.

[7]    On the other hand, IM-III and IM USA were Debtors in the bankruptcy case and are now known as KG III Winddown, LLC, and KG USA Winddown, LLC.  (*See* Case No. 20-11723, ECF Doc. # 400, ¶ 17.)

[8]    All page number references in citations to documents filed on ECF refer to the page number automatically generated by ECF in the header of the document, rather than any page number that may otherwise appear in the document.

1981, the Il Mulino brand has grown to encompass four distinct Il Mulino concepts—Il Mulino

New York, Trattoria Il Mulino, Il Mulino Prime, and Bistecca by Il Mulino.  (*Id.* ¶ 3.)  Currently,

there are fifteen restaurants operating under one of these four Il Mulino concepts across the

continental United States and Puerto Rico.  (*Id.* ¶ 4.)

### B.  Mr. Katzoff and His Business Partners Acquire Il Mulino

In 2002, Mr. Katzoff and his business partners created two entities, IM-I and IM-II.  (*Id.*

¶ 5.)  On September 12, 2002, IM-II acquired 80% of the shares of GFB, and IM-I acquired all

rights, title, and interests in the intellectual property relating to the Original Restaurant (the

"Intellectual Property").[9]  (*Id.* ¶¶ 6–7; Pls. Exs. 1–2.)  The Intellectual Property was, and remains,

IM-I's only material asset.  (Stipulated Facts ¶ 7.)

### C.  The GFB License

IM-I granted the GFB License on September 23, 2002.  The GFB License is governed by

New York law.  (GFB License ¶ 19.)

The GFB License granted GFB:

> an exclusive license (the "License") during the term of this
> Agreement to use Licensor's trade name of Il Mulino for the
> restaurant located at 86 West Third Street, New York, New York.

(*Id.* ¶ 3.)  The GFB License contains a territorial restriction: the "License . . . may be used only

in the Territory."  (*Id.*)  The Territory is defined as "the restaurant located at 86 West Third

Street, New York, New York."  (*Id.*)

---

[9]      The term "Intellectual Property" is also used in the IM-III License.  This opinion uses the term "Intellectual Property" throughout.  To be clear, as used in this opinion, "Intellectual Property" means "all intellectual property relating to the Original Restaurant," and the Court finds that the definition of "Intellectual Property" in the IM-III License, although lengthier, is identical in its meaning.

The GFB License originally included a licensing fee of 15% of gross sales,[10] which was reduced to 5% in an amendment dated as of January 1, 2005. (*Id.* ¶ 6; "2005 Amendment," Pls. Ex. 22, ¶ 2.)

The term of the GFB License is as follows:

> **4. Term of Agreement – Extensions.** The term of this Agreement shall be ten years commencing with the date of this Agreement. The term will be automatically extended for an additional ten years unless either party notifies the other of its intention not to continue the Agreement in force for the extended term. This notice must be in writing, addressed to the address given above for the party to be notified, mailed by certified or registered mail, and posted no later than six months before the end of the original term of this Agreement.

(GFB License ¶ 4.) The parties have stipulated that "[o]n September 23, 2012, . . . the GFB License was renewed for its second and final ten-year term."[11] (Stipulated Facts ¶ 12.)

The GFB License was amended again on April 5, 2020. ("2020 Amendment," Pls. Ex. 143.) The 2020 Amendment provides, in pertinent part, that the parties agree to amend the GFB License as follows:

> 1. Expand the purpose of the License Agreement to allow the use of the Intellectual Property in the development of additional restaurants and the development, manufacture, sale and distribution of products, including sauces and foods, pursuant to the terms of this license.
>
> 2. Expand automatically, the term of the agreement for an additional 20 years from the end of the License Agreement between the parties dated September 23, 2002 to September 23, 2042.
>
> 3. "Royalty for the Use of the Trade Name and Trademark" shall be amended to eliminate any and ALL royalty fees from the Licensee to the Licensor for the use of the Trademarks. Also, Paragraph 6 in

---

[10]    The original royalty rate followed a slightly more complicated formula than simply 15% of gross sales, but the particulars of that formula are not relevant to this opinion.

[11]    The parties dispute whether IM-I can extend the term of the GFB License (or grant a new license) beyond its September 22, 2022, expiration date. But those issues are not included in the Joint Pretrial Order. Therefore, the Court does not decide whether GFB can be granted a license extending beyond September 22, 2022.

> the original license agreement shall be eliminated and this paragraph
> will replace it.
>
> 4. Waive and forgive any prior fees earned by the Licensor from the
> Licensee.
>
> 5. All other terms of the license agreement will remain in full force
> and effect.

(2020 Amendment ¶¶ 1–5.)

The term "Intellectual Property" is not clearly defined in the 2020 Amendment, but

appears to refer only to "trademarks (common law and federal applications), and domain names

relating to ILMulino and ILMulino New York" owned by IM-I that are "generated from the

operation of the ILMulino restaurant located at 86 West Third Street, New York, NY":

> WHEREAS, Licensor is the valid legal owner of the trademarks
> (common law and federal applications), and domain names relating
> to ILMulino and ILMulino New York.  This Intellectual Property
> are all the creations and generated from the operation of the
> ILMulino restaurant located at 86 West Third Street, New York, NY
> ("the Intellectual Property").

(*Id.*)

The 2020 Amendment was rescinded in its entirety on May 24, 2021.  ("2021

Amendment," Pls. Ex. 202.)

### D.  The IM-III License

IM-III was founded on February 4, 2004; IM USA was founded on March 5, 2004.

(Stipulated Facts ¶¶ 24, 26.)  On March 5, 2004, IM-I entered into a license agreement with IM-

III.  (IM-III License.)  On the same day, IM-III assigned the IM-III License to IM USA.

(Stipulated Facts ¶ 29; Pls. Ex. 18 at 13–16.)  The IM-III License is governed by New York law.

(IM-III License § 7.2.)

The IM-III License provides:

> 1.1. <u>Grant of Rights.</u> Subject to the following terms and conditions, Licensor [IM-I] hereby grants to Licensee [IM-III] during the Term (as hereinafter defined), an exclusive, except for the licenses listed on Exhibit A attached hereto, royalty-free right and license to use the Intellectual Property in connection with the Restaurants and the development, manufacture, sale and distribution of products throughout the Territory (as hereinafter defined) pursuant to the terms of this License.

(IM-III License § 1.1.)  The second "whereas" clause of the IM-III License defines "Restaurants" as "additional IL MULINO NEW YORK restaurants and other restaurants." (*Id.* at 1.)  The entire clause is as follows:

> WHEREAS, Licensor has previously licensed the Intellectual Property in connection with the operation of IL MULINO NEW YORK restaurants, and now desires to license the Intellectual Property to Licensee to develop, operate and/or franchise additional IL MULINO NEW YORK restaurants and other restaurants (the "Restaurants") and to develop products pursuant to the terms hereof.

(*Id.*)

The IM-III License provides that "[t]he territorial grant shall be worldwide, subject to the existing licenses listed on Exhibit A attached hereto." (IM-III License § 2.1.)  Exhibit A includes two licenses:

1. a license agreement dated August 14, 2003, between IM-I and I.M. Dallas, Ltd., for an Il Mulino New York restaurant in Dallas, Texas (*id.* at 10–35), and

2. a franchise agreement dated August 7, 2003, between IM-I and WDI Corporation, for an Il Mulino franchise in Tokyo, Japan (*id.* at 36–49).

Notably, Exhibit A does not list the GFB License as an existing license.  The failure to include the GFB License in Exhibit A is a key component of the Plaintiffs' arguments in this case.

The IM-III License was amended on July 3, 2012, to allow IM-I to license certain rights in the Intellectual Property to IM 60th Street, LLC, for a restaurant to be opened and called Il Mulino New York – Uptown.  (Stipulated Facts ¶ 30.)

The IM-III License was amended again on December 5, 2012, changing the term from 20 years to a perpetual term, "subject to termination provided in Paragraph 6.2."  (Pls. Ex. 68 ¶ 1.)

### E.  Sublicenses from IM USA

On June 4, 2012, IM USA entered into a sublicense with The TJX Companies, INC ("TJX"), granting TJX the right to use certain trademarks and intellectual property to produce and sell "Merchandise."  (Stipulated Facts ¶ 32.)

From 2014 to 2019, IM USA entered into sublicenses with Pasta Perfect, LLC, IMNY GS, LLC, Il Mulino Gramercy, LLC, and IMNY BOCA, LLC, granting those entities the right to use certain intellectual property in connection with the opening of new restaurants.  (*Id.* ¶¶ 32–36.)  These sublicenses were "royalty-free."  (Pls. Exs. 73, 112, 124, 128.)

### F.  IM USA Enters into a Credit Agreement with BSP

In June 2015, BSP, as agent, and IM USA, K.G. IM, and IM-III entered into a credit agreement.  (Stipulated Facts ¶ 45.)  Under the credit agreement, IM USA could borrow up to $30 million; the initial proceeds were $21 million.  (*Id.* ¶ 46.)  The maturity date under the credit agreement was June 15, 2020.  (*Id.* ¶ 47.)  Also in June 2015, IM USA and BSP entered into a collateral assignment of contract whereby IM USA granted BSP a security interest in IM USA's rights under the IM-III License.  (*Id.* ¶ 49.)

In connection with the proposed financing, Citrin Cooperman completed a due diligence report at BSP's request.  The report states that "[l]icensing fees are charged by IM1 to GFB . . . ."[12]  (Defs. Ex. O at 7.)

### G.  The Debtors Encounter Financial Distress and Prepare for Bankruptcy

On June 2, 2020, BSP delivered notices of events of default to certain Debtors and provided notice that it was accelerating its loans.  (Stipulated Facts ¶ 56.)

On June 30, 2020, Gerard Catalanello (the Debtors' counsel in the bankruptcy case), wrote to Michael Goldstein (BSP's counsel in the bankruptcy case), stating that "there is a direct license between IM LLC-I and GFB (it predates IM USA and was put in place when GFB was purchased many years before the BSP transaction)."  (Defs. Ex. GG at 2–3.)  Mr. Catalanello also stated:

> I think the only way to truly understand all of these relationships and the rights of all of these entities is to have Brian Gallagher involved in this process now.  He has handled all of the relevant transactions and understands all of the pieces to this puzzle better than anyone (on the legal or business side).

(*Id.* at 3.)  Further emails between Mr. Catalanello and Mr. Goldstein continued as follows:

> Goldstein: Thank you for the follow-up.  Of course, we need to receive a copy of the documentation.
>
> Catalanello: Ok, but I don't have that.  Would need to get Gallagher involved.
>
> Goldstein: I guess you better get Jerry[13] on that.  We made our proposal re Gallagher.

---

[12]     The reference in this due diligence report to that IM-I charged license fees to GFB undercuts the Plaintiffs' argument that IM-I did not disclose the GFB License to BSP, or that the failure to list the GFB License in Exhibit A to the IM-III License was a breach of the IM-III License.

[13]     Likely referring to Mr. Katzoff.

(Pls. Ex. 205 (simplified formatting).)[14]

### H.  The Debtors Enter Bankruptcy and Sell Substantially All Assets to Plaintiffs

On July 28, 2020, the Debtors filed voluntary petitions for relief under chapter 11 of the

Bankruptcy Code.  (Stipulated Facts ¶ 57.)  On August 3, 2020, BSP responded to the chapter 11

filing with a motion to lift the automatic stay to permit BSP to foreclose on its collateral, arguing

that the Debtors were not authorized to file voluntary chapter 11 petitions because of the terms of

BSP's security interests and rights.  (Case No. 20-11723, ECF Doc. ## 19–24.)  The issues raised

by BSP's motion threatened to derail the chapter 11 cases.  The issues were consensually

resolved by a stipulation and order entered on August 14, 2020.  (CRO Order.)[15]  Relevant to the

issues in this trial, that stipulation removed Mr. Katzoff from exercising management control

over the Debtors during the chapter 11 case, ceding most of the authority to the CRO.

This Court approved the sale of substantially all of the Debtors' assets to BSP on

December 22, 2020.  (Sale Order.)  The sale closed on December 24, 2020.  (Case No. 20-11723,

ECF Doc. # 396.)  Under the Asset Purchase Agreement, the Plaintiffs were assigned the IM-III

License.  (*Id.*, ECF Doc. # 396-2 at 145; Stipulated Facts ¶ 58.)

### I.  The Post-Closing Letters

Following the closing of the sale of the Debtors' assets to BSP, Mr. Katzoff's counsel

sent two letters to the Debtors' counsel[16]—one on January 6, 2021 (the "January 6 Letter," Pls.

---

[14]    These emails further substantially undercut BSP's argument—pressed by BSP's trial counsel until
Defendants' counsel identified these as trial exhibits—that Defendants hid from BSP the facts about the GFB
License before the section 363 sale closed.

[15]    The United States Trustee ("UST") challenged entry of the stipulation providing the CRO with expanded
powers.  The Court overruled the UST's objection in a written opinion.  *See In re K.G. IM, LLC*, 620 B.R. 469
(Bankr. S.D.N.Y. 2020).

[16]    These letters were addressed only to the Debtors' bankruptcy counsel and not to BSP's counsel.

Ex. 179), and one on January 12, 2021 (the "January 12 Letter," Pls. Ex. 180, and, with the

January 6 Letter, the "Post-Closing Letters").

The January 6 Letter addresses two main topics.  First, it acknowledges that "Mr. Katzoff

no longer has a role with the entities that were sold by the Debtors to Buyer" and expresses

concerns that he may still be a "responsible person" with respect to various state liquor

authorities.  (January 6 Letter at 2.)  Second, it asserts "that the 'ilmulino.com' domain name,

and all that comes with it, was not owned by a Debtor entity and, thus, was not sold to Buyer."

(*Id.* at 3.)  The January 6 Letter goes on to state that

> [o]n or about January 15, 2021, Mr. Katzoff intends to remove
> unauthorized email users of, or access to, this domain name.
> Moreover, as of that same date, Mr. Katzoff intends to take steps to
> remove the Buyer-owned entities from all web-based and social
> media accounts linked to the "ilmulino.com" domain name and/or
> that have been maintained by Mrs. Katzoff . . . .

(*Id.*)

The January 12 Letter refers to the January 6 Letter—noting that it had "indicated that

Mr. Katzoff would, on January 15, 2021, begin the process of disentangling the former debtor

entities from the 'ilmulino.com' domain"—and states that Mr. Katzoff would extend the date to

from January 15, 2021, to January 22, 2021, "[t]o help facilitate an orderly transition."  (January

12 Letter at 2.)

## J.  The Adversary Proceeding

The Plaintiffs commenced this adversary proceeding on January 27, 2021.  ("Complaint,"

ECF Doc. # 1.)[17]  The Plaintiffs immediately sought a temporary restraining order and

preliminary injunction

---

[17]        The operative complaint is the second amended complaint.  ("Second Amended Complaint," or "SAC,"
ECF Doc. # 43-2.)

> enjoining and restraining Gerald Katzoff ("Mr. Katzoff") or any
> person or entity acting on his behalf from (a) directly or indirectly,
> representing, purporting or alleging to any person that Mr. Katzoff
> has any management, voting rights, consent rights, consultation
> rights or powers with respect to any of the Debtors, and taking any
> action or inaction, to assert, exercise, or cause a third party to assert
> or exercise, any management, voting rights, consent rights,
> consultation rights or powers with respect to any of the Debtors or
> any entity managed by any Debtor; (b) taking any action with
> respect to the Liquor Licenses and Permits held by, in the name of,
> or otherwise within the control of any Debtor or any entity managed
> by any Debtor; and (c) taking any action with respect to the domain
> name ilmulino.com or any other website used by or licensed to any
> Debtor; (d) taking any action with respect to any social media
> accounts associated in any way with the Il Mulino restaurants or
> products; and (e) taking any actions with respect to any e-mail
> accounts of any employee or former employee of the Debtors . . . .

(ECF Doc. ## 2–3.)

On February 5, 2021, the Court entered a stipulation and order resolving the motions for a temporary restraining order and preliminary injunction and providing a framework for the use of ilmulino.com and associated accounts during the pendency of this action. (Stipulation.)

On June 28, 2021, the Court held the evidentiary phase of the trial using Zoom for Government. Direct testimony was presented by declarations, with live cross-examination. The Plaintiffs' witnesses were Craig Boucher, the CRO, and Brent Buckley, a managing director of BSP; the Defendants' only witness was Gerald Katzoff. The Court heard closing argument, again using Zoom for Government, on July 19, 2021.

The parties also submitted three rounds of briefing. (Pls. Br.; "Defs. Br.," ECF Doc. # 68; "Pls. Reply," ECF Doc. # 77; "Defs. Reply," ECF Doc. # 76; "Pls. Supp.," ECF Doc. # 91; "Defs. Supp.," ECF Doc. # 90.)

In the next sections of this opinion, the Court discusses and rules on each of the causes of action on which the parties went forward at trial—Sections II through XI for each of the Plaintiffs' causes of action and Section XII.A & B for the Defendants' counterclaims.

## II.    <u>COUNT I: VIOLATION OF THE CRO ORDER</u>

The CRO Order provides, in relevant part:

> B.  The CRO shall have sole and exclusive power to exercise all of the management, voting rights, consent rights and powers of each of the Debtors . . . .

> C.  Each of the Debtors, Katzoff, Galligan and J.B. IM, LLC, solely in its capacity as manager of Debtor IMNY Hamptons, LLC, hereby expressly consent to the appointment of the CRO and expressly irrevocably waive any such management, voting rights, consent rights, consultation rights or powers any of them may have with respect to any of the Debtors . . . .

> D.  Neither Katzoff nor Galligan shall directly or indirectly, represent, purport or allege to any person that he has any management, voting rights, consent rights, consultation rights or powers with respect to any of the Debtors, or take any action or inaction, to assert, exercise, or cause a third party to assert or exercise, any management, voting rights, consent rights, consultation rights or powers with respect to any of the Debtors. In addition, as long as the CRO is in place, BSP shall not directly or indirectly, assert any management, voting rights, consent rights or powers with respect to any of the Debtors, or take any action or inaction, to assert, exercise, or cause a third party to assert or exercise, any management, voting rights, consent rights or powers with respect to any of the Debtors.

(CRO Order ¶ II.)

The Plaintiffs focus specifically on language in Paragraph II.D: "The CRO Order prohibits Mr. Katzoff from taking 'any action or inaction, to assert, exercise, or cause a third party to assert or exercise any management, voting rights, consent rights, consultation rights or powers with respect to any of the Debtors.'"  (SAC ¶ 121 (quoting CRO Order ¶ II.D).)  The Plaintiffs submit that the CRO Order barred Mr. Katzoff from "asserting any rights over the Domain Name Rights that were transferred by the Debtors to the Buyer under the Asset Purchase Agreement and Sale Order."  (*Id.* ¶ 122.)  The Defendants argue that the Post-Closing Letters are an assertion of rights by Mr. Katzoff on behalf of *non-Debtor* IM-II, not an assertion of

13

management rights on behalf of any *Debtor* entity.  (Defs. Br. at 35.)  The Plaintiffs respond that, "in furnishing the Post-Closing Letters, Mr. Katzoff engaged in efforts to prevent or hinder Debtors' restaurants from accessing the Il Mulino Websites and Social Media Accounts, and instead exert control over their public-facing online presence."  (Pls. Br. at 92.)  The Plaintiffs argue that this constituted an "attempt[] to exercise control over the Debtor entities' property interests and assets" in violation of the CRO Order.  (*Id.*)

The Plaintiffs are correct that the CRO Order stripped Mr. Katzoff of his management rights with respect to the Debtors.  (CRO Order ¶ II.D.)  However, the Defendants are also correct that the Post-Closing Letters take the position that the domain name rights are owned by a *non-Debtor*.  (*See* January 6 Letter ("We had previously informed you that the 'ilmulino.com' domain name, and all that comes with it, was *not owned by a Debtor entity* and, thus, was not sold to [BSP]." (emphasis added)).)  While the position asserted by Mr. Katzoff in the Post-Closing Letters is problematic for other reasons (discussed below)—particularly to the extent that the Post-Closing Letters purport to assert rights over "all that comes with [the ilmulino.com domain name]," and not merely ownership—it is not correct that the Post-Closing Letters were a willful assertion of management rights *of the Debtors*.  The Post-Closing Letters were explicitly an effort to "disentangle" Debtor and non-Debtor entities, with Mr. Katzoff purportedly asserting the rights of non-Debtors (as well as trying to protect himself personally with respect to "responsible person" liability under the liquor licenses).  Thus, while the position taken by Mr. Katzoff in the Post-Closing Letters with respect to the use of the ilmulino.com domain name is inconsistent with the rights granted under the IM-III License, it is not a violation of the CRO Order.

Accordingly, the Plaintiffs are not entitled to a judgment declaring that the Post-Closing Letters violate the CRO Order.

### III.    <u>COUNT II: VIOLATION OF THE SALE ORDER</u>

#### A.  The Post-Closing Letters Violated the Sale Order

The Sale Order provides, *inter alia*, that "[a]ll Persons having Claims of any kind or nature whatsoever against the Debtors or the Purchased Assets shall be forever barred, estopped, and permanently enjoined from pursuing or asserting such Claims against the Buyer or any of its assets, property, Affiliates, successors, assigns or the Purchased Assets." (SAC ¶ 128 (quoting Sale Order ¶ Q).) The Plaintiffs submit that "[t]he Post-Closing Letters assert claims that fall within the scope of 'Claims' against the Buyer as defined in the APA which are permanently barred, estopped and enjoined." (*Id.* ¶ 129.) The Plaintiffs also argue that they "suffered harms from not receiving clear title and rights to use the Il Mulino Domains that were supposed to have been transferred to Plaintiffs pursuant to the APA," as well as "the harm of incurring attorneys' fees and costs in order to prosecute this claim and vindicate Plaintiffs' property rights." (Pls. Supp. at 51.)

The Plaintiffs argue that the Post-Closing Letters interfered with their receipt of "clear title," but the Plaintiffs did not purchase title to the Il Mulino Domains because the Debtors did not own the Il Mulino Domains—IM-I did. The Plaintiffs did, however, purchase the IM-III License and, with it, the right to use the Il Mulino Domains. The definition of "Claims" in the Sale Order is extremely broad,[18] and Mr. Katzoff's threatened interference with the Plaintiffs'

---

[18]        Paragraph Q of the Sale Order provides, in relevant part:

> Notwithstanding any provision to the contrary in any other agreement, the Debtors are authorized to sell the Purchased Assets to the Buyer free and clear of all liens, claims, encumbrances and interests against the Debtors or the Purchased Assets, including, without limitation, any debts, claims (including all "claims" as defined

rights under the IM-III License qualifies as the assertion of a Claim and was barred by the Sale

Order.

Thus, to the extent that the Post-Closing Letters assert "claims" or "interests against . . .

the Purchased Assets," they violate the Sale Order.  (*See* Sale Order ¶ Q.)  Accordingly, the

Plaintiffs are entitled to a declaration that the Post-Closing Letters violated the Sale Order (but

not the CRO Order).  For reasons discussed below, however, the Plaintiffs are not entitled to

attorneys' fees in connection with Count I.

### B.  The Plaintiffs Are Not Entitled to Attorneys' Fees for Mr. Katzoff's Violation of the Sale Order

The Plaintiffs also seek attorneys' fees in connection with Count II for the Defendants'

allegedly sanctionable behavior.  (Pls. Supp. at 57–58.)  Since the Defendants did not violate the

---

in the Bankruptcy Code), rights, causes of action, and/or suits arising under or out of, in connection with, or in any way relating to, any acts, omissions, obligations, demands, guaranties, rights, contractual commitments, restrictions, limitations, restrictions, or conditions in any organizational documents governing any of the Purchased Assets, product liability claims, environmental liabilities, employee pension or benefit plan claims, multiemployer pension or benefit plan claims (including any such claim arising out of, relating to, or resulting from the Debtors' withdrawal from participation in any such plans), labor agreement claims (including, but not limited to, any such claim relating to any and all collective bargaining agreements), workers' compensation claims, severance claims, retiree healthcare or life insurance claims, and/or claims for taxes of or against the Debtors and/or the Purchased Assets, and any derivative, vicarious, transferee, or successor liability claims, rights, or causes of action (whether in law or in equity, under any law, statute, rule, or regulation of the United States, any state, territory, or possession thereof, or any other applicable jurisdiction), whether arising prior or subsequent to the commencement of these chapter 11 cases, whether known or unknown, fixed or contingent, anticipated or unanticipated, accrued or not, or imposed by agreement, understanding, Law, equity, or otherwise arising under or out of, in connection with, or in any way related to the Debtors, the Debtors' interests in the Purchased Assets, the operation of the Debtors' business before the Closing, or the transfer of the Debtors' interests in the Purchased Assets to the Buyer, all Excluded Assets, and all Excluded Liabilities (collectively, excluding any Assumed Liabilities and Permitted Liens, the "**Claims**"). . . .  All Persons having Claims of any kind or nature whatsoever against the Debtors or the Purchased Assets shall be forever barred, estopped, and permanently enjoined from pursuing or asserting such Claims against the Buyer or any of its assets, property, Affiliates, successors, assigns, or the Purchased Assets . . . .

(Sale Order ¶ Q.)

CRO Order, the Plaintiffs are not entitled to attorneys' fees in connection with Count I. While

Defendants did violate the Sale Order, based on the caselaw that the Plaintiffs cite, they are also

not entitled to recover attorneys' fees in connection with Count II. Mr. Katzoff's behavior

manifested in the Post-Closing Letters does not rise to the level of willful, egregious conduct that

can form the basis for recovery of attorneys' fees.

In support of their claim for attorneys' fees, the Plaintiffs rely on *Lehman Bros. Holdings*

*Inc. v. Barclays Capital Inc. (In re Lehman Bros. Holdings Inc.)*, Adv. Proc. No. 10-04103

(JMP), 2013 WL 6283572 (Bankr. S.D.N.Y. Dec. 3, 2013), *aff'd*, 526 B.R. 481 (S.D.N.Y. 2014),

*aff'd*, 645 F. App'x 6 (2d Cir. 2016). (Pls. Br. at 94.) In *Lehman Bros.*, the bankruptcy court

granted the defendant-purchaser's motion for sanctions and awarded

> reasonable counsel fees and costs incurred in defending against this
> litigation that has been pursued knowingly by [the plaintiff] in
> violation of the Sale Order. This award of civil contempt sanctions
> will serve to shift the cost of litigation to a sophisticated financial
> institution that understood the risks and should have known better
> than to go after the purchaser of the Purchased Assets.

*Id.* at *5. The court relied on the following three-element formulation of civil contempt: "(1) the

order the contemnor failed to comply with is clear and unambiguous, (2) the proof of

noncompliance is clear and convincing, and (3) the contemnor has not diligently attempted to

comply in a reasonable manner." *Id.* at *1 (quoting *Paramedics Electromedicina Comercial,*

*Ltda. v. GE Med. Sys. Info. Techs., Inc.*, 369 F.3d 645, 655 (2d Cir. 2004)). The *Lehman Bros.*

court found that its sale order was clear and unambiguous and that the sale order "enjoin[ed] the

assertion of any claim against [the defendant-purchaser] based on an interest in the Purchased

Assets." *Id.* at *2. The court also found that the plaintiff's

> lawsuit against . . . the purchaser of significant assets in one of the
> largest and most prominent bankruptcy sales of all time was a
> decision bordering on the reckless . . . [and was] "clear and
> convincing" evidence of non-compliance with a Sale Order

> injunction that was designed to block the very behavior in which
> [the plaintiff] chose to engage.

*Id.* at *3.  Finally, the court found that the plaintiff had "willfully . . . disregarded the injunction

and . . . taken the position that [the plaintiff's] own rogue legal theory gave it the right to

proceed . . . with impunity."  *Id.* at *4.  Notably, the plaintiff had been given an opportunity, after

the completion of discovery, "to discontinue [the] adversary proceeding and avoid any risk of

sanctions, but [the plaintiff] refused that offer."  *Id.*

The Plaintiffs also cite *Weitzman v. Stein*, 98 F.3d 717 (2d Cir. 1996), for the proposition

that "a finding of willfulness strongly supports granting [an award of fees and costs]."  (Pls. Br.

at 94 (quoting *Weitzman*, 98 F.3d at 719) (alteration in original).)  In *Weitzman*, the party seeking

to recover attorneys' fees was the holder of a judgment and had obtained a court order to seize a

vehicle belonging to the judgment debtor.  *Weitzman*, 98 F.3d at 718.  The order plainly

prohibited the judgment debtor or his representatives from interfering with the order.  *Id.*

Nevertheless, the judgment debtor's attorney "delivered by hand a letter to the sheriff's office

stating that the vehicle held for sale did not belong to [the judgment debtor], but to his wife . . . ,

and that the car subject to seizure was another one."  *Id.*

The Plaintiffs also cite this Court's decision in *In re Plumeri*, No. 10-10050 (MG), 2010

WL 3087685 (Bankr. S.D.N.Y. 2010), which imposed sanctions on a debtor's attorney where,

"[d]espite knowing that a judgment of possession was entered against his client prior to filing the

Initial Petition, [the attorney] did not disclose this fact either in the Initial Petition or the First

Amended Petition, as required by 11 U.S.C. § 362(*l*)(5)."  *Plumeri*, 2010 WL 3087685 at *3.

The Court awarded fees lower than the amount sought by the creditor, noting that "only fees that

are directly caused by the sanctionable conduct may be awarded.  Even then, the awarding court

must make a determination whether the requested fees are reasonable."  *Id.* at *4.  Thus, to the

extent that the Plaintiffs were entitled to recover any attorneys' fees—which they are not—they would only be able to recover fees attributable to the Post-Closing Letters' violation of the Sale Order.

The Plaintiffs are not entitled to recover attorneys' fees based on the caselaw they rely on. They have not established the elements present in *Lehman Bros.* The Sale Order is clear and unambiguous; and it may even be that the Post-Closing Letters constitute clear and convincing proof of noncompliance with the Sale Order, as Mr. Katzoff asserted an interest in the Intellectual Property granted by the IM-III License to IM-III, which was assigned to IM USA and purchased by the Plaintiffs pursuant to the Sale Order. However, the Plaintiffs failed to demonstrate the third element, i.e., that Mr. Katzoff did not diligently attempt to comply in a reasonable manner. First, there is no evidence in the record that Mr. Katzoff acted on any of the threats in the Post-Closing Letters to exclude the Plaintiffs from the Il Mulino Domains. Second, within several weeks after the threats were made, the parties entered into the Stipulation that was so-ordered by the Court. While the Stipulation is in effect, Mr. Katzoff may not:

> a. Remove or revoke access of any employee or agent of Plaintiffs who currently uses an email account that ends with "ilmulino.com" (each, an "IM Email Account");
>
> b. Remove or revoke access of any employee or agent of Plaintiffs who currently has any level of access to use, maintain or update the websites operated for the benefit of the restaurants operating under the Il Mulino brand, including but not limited to, www.ilmulino.com (the "Website");
>
> c. Remove or revoke access of any employee or agent of Plaintiffs who currently has any level of access to use, maintain or update the web-based and social media accounts linked to the "ilmulino.com" domain name (the "IM Social Media Accounts");
>
> d. Make any changes to any information concerning the Acquired Operating Restaurants, the Managed Operating Restaurants, the Franchise Restaurants, or the Products Business (the entities and businesses set out in this paragraph, collectively, are the "Buyer

> Entities") on the Website, except with the prior written consent of
> the Plaintiffs;
>
> e. Make any changes to any information or postings concerning the
> Buyer Entities on the IM Social Media Accounts, except with the
> prior written consent of the Plaintiffs;
>
> f. All changes to the Website and IM Social Media Accounts shall
> be consistent with the terms of section 5 below.

(Stipulation § 2.)  There is no evidence that Mr. Katzoff or any of the Defendants failed to

comply with the Stipulation since it has been in effect.  Moreover, and as the Plaintiffs point out,

the Defendants have admitted that the "Plaintiffs hold rights pursuant to the IM-III License to

use the Il Mulino Domains."  (Pls. Supp. at 27 (citing, *inter alia*, Defs. Br. at 36).)  Regardless of

whether the Defendants violated the Sale Order, the Court finds that, when given an opportunity

to comply with the Sale Order, the Defendants have brought themselves into compliance.  This is

a far cry from the situation in *Lehman Bros.*, where the plaintiff was given multiple opportunities

to abandon its lawsuit and yet it persisted, or in *Plumeri*, where the debtor's attorney failed on

multiple occasions to disclose the landlord's judgment of eviction against the debtor as required

by statute.

As this Court has noted (in a case cited by the Plaintiffs), "[o]nly when there has been a

substantial departure from . . . [the high] standards [of professional conduct required of attorneys

appearing in bankruptcy court] must the Court deal with sanctions issues."  *In re Green*, 422

B.R. 469, 472 (Bankr. S.D.N.Y. 2010).  This is not such a case.  Accordingly, the Plaintiffs are

not entitled to an award of attorneys' fees in connection with Count II.

## IV.   COUNT III: DECLARATION OF DOMAIN NAME RIGHTS

Count III, as originally framed in the Second Amended Complaint, is for "Declaring a

*License* of the Domain Name Rights."  (SAC at 27 (emphasis added).)  However, as the case

proceeded, the Plaintiffs took conflicting positions with respect to this count, at times arguing

that they have *ownership* of the Intellectual Property, rather than simply a *license*:

> trial will show that all expenses for maintenance and upkeep of the
> websites and social media, including compensation for the
> employees and consultants who worked on them, was paid by IM
> USA. As a result, Debtor IM USA was the registrant and record
> owner of each of the Il Mulino Websites, corresponding Email
> Accounts, and Social Media Accounts.
>
> Pursuant to the APA, BSP also acquired "all of the Sellers'
> telephone numbers, fax numbers, e-mail addresses, websites, URLs
> and internet domain names related to the Business." APA § 2.1(x).
> Accordingly, *Plaintiffs acquired the Il Mulino Websites, Email
> Accounts, and Social Media Accounts*, and are entitled to an order
> requiring Defendants to transition control of the these [sic] assets.

(Pls. Br. at 87–88 (emphasis added).) However, in other places, the Plaintiffs reversed their

position, arguing that they only have a license, rather than ownership, of the Intellectual

Property:

> As set forth in Plaintiffs' opening brief, Plaintiffs' Second Amended
> Complaint is premised upon IM-I's ownership over the Il Mulino
> Intellectual Property and brings claims solely based on Plaintiffs'
> ***exclusive license to use and sublicense to others the Il Mulino
> Intellectual Property***. Defendants concede that Plaintiffs are
> challenging ***only*** that Defendants do not have rights to use the Il
> Mulino Intellectual Property "in connection with the Il Mulino
> location at 86 West 3rd Street . . . ." Def. Br. at 28-29 (quoting
> Plaintiffs' Second Amended Complaint ¶ 103). Plaintiffs' claims
> are entirely consistent with the IM USA License, as ***Plaintiffs do
> not challenge IM-I's ownership*** over the Intellectual Property, only
> IM-I's breaching grant of a license that conflicts with exclusive
> rights to license it granted to IM USA.

(Pls. Reply at 29 (emphasis in original).)

Despite these inconsistencies in the Plaintiffs' briefs, the parties stipulated that "[t]he Il

Mulino Intellectual Property was, and remains, IM-I's only material asset." (Stipulated Facts ¶

7.) The Plaintiffs' claim that they have a license to use the Intellectual Property is itself an

admission that the Plaintiffs do not own the Intellectual Property.

Moreover, the IM-III License includes an explicit provision acknowledging IM-I's ownership of the Intellectual Property and a prohibition on the Licensee's assertion of "any right, title or interest in or to the Intellectual Property":

3.1 <u>Ownership of the Intellectual Property.</u>

3.1.1.  Licensee acknowledges and agrees that Licensor is the owner of all right, title and interest in and to the Intellectual Property, including all related trademark registrations and applications for registration and all "il mulino" formative domain names, even if registered to Licensee, and substantially similar domain names, even if registered to Licensee, and retains all rights therein except as g ranted herein, and that no such right, title or interest therein is conveyed hereby.  Licensee shall not challenge or, directly or indirectly, assert any right, title or interest in or to the Intellectual Property or any "il mulino" formative trademark applications for registration or registration thereof or any "il mulino" formative domain names or substantially similar domain names.  Licensee shall not use or permit others to use the Intellectual Property or an "il mulino" formative trademark, company name, domain name or a substantially similar trademark, company name or domain name in any way inconsistent with Licensor's rights therein and all uses of the Intellectual Property shall inure to the benefit of Licensor.

(IM-III License § 3.1.)  An assertion that the Plaintiffs, rather than IM-I, own the Intellectual Property would be a clear breach of this section.[19]

Accordingly, to the extent that the Plaintiffs (at some points) argue that they are in fact the *owners* of the Intellectual Property, the Court concludes that IM-I is the owner of the Intellectual Property.

To the extent that the Plaintiffs request a declaration that they only have a *license* from IM-I to use the Intellectual Property, the Court concludes that they do indeed have such a license

---

[19]    The Defendants' counterclaim regarding such an alleged breach is discussed later in this opinion.

under the IM-III License.  However, that license is limited only to certain purposes—which do not conflict with the GFB License—as further explained in the following section.

## V.    COUNT IV: BREACH OF THE IM-III LICENSE

### A.  Whether Extrinsic Evidence May Be Considered in Interpreting the Licenses

The GFB License and the IM-III License each include a merger clause, indicating that the license is "the complete understanding between the parties concerning the subject thereof" (GFB License ¶ 18) and "the entire agreement between the parties with respect to its subject matter" (IM-III License § 7.3).

The GFB License and the IM-III License are each governed by New York law.  (GFB License ¶ 19; IM-III License § 7.2.)  Merger clauses are strictly enforced under New York law:

> Courts and commentators addressing the substantive and procedural aspects of New York commercial litigation agree that the purpose of a general merger provision, typically containing the language . . . that it "represents the entire understanding between the parties," is to require full application of the parol evidence rule in order to bar the introduction of extrinsic evidence to vary or contradict the terms of the writing.  The merger clause accomplishes this objective by establishing the parties' intent that the Agreement is to be considered a completely integrated writing.  A completely integrated contract precludes extrinsic proof to add to or vary its terms.

*Primex Int'l Corp. v. Wal-Mart Stores*, 679 N.E.2d 624, 627 (N.Y. 1997) (citations omitted).

Notwithstanding this strict rule, extrinsic evidence may be considered to interpret ambiguities in a fully integrated contract, as long as the interpretation does not add to or vary the terms of the contract.  As explained by the Second Circuit:

> Even though a document may be fully integrated with respect to the ultimate terms of the agreement, the meaning of those terms may remain unclear.  In such cases, it is proper to consider extrinsic evidence in interpreting the ambiguous terms, irrespective of the parol evidence rule.

*Topps Co. v. Cadbury Stani S.A.I.C.*, 526 F.3d 63, 69 (2d Cir. 2008) (internal quotation marks and citations omitted).

Here, the many ambiguities in the licenses require the Court to consider extrinsic evidence. Those ambiguities and their interpretation are discussed below.

## B. The *Original* Parties' Intent Should Be Considered in Interpreting the Licenses

To the extent that the Court may consider extrinsic evidence of the parties' intent to interpret the licenses, the licenses should be interpreted considering the intent of the *original* parties to the contract. The Plaintiffs, as assignees of the IM-III License, are bound by the intent of the original parties, as "an assignee stands in the shoes of the assignor and subject to all equities against the assignor. An assignee takes all rights of the assignor, no greater and no less." *Sompo Japan Ins. Co. of Am. v. Norfolk S. Ry. Co.*, 966 F. Supp. 2d 270, 279 (S.D.N.Y. 2013) (internal quotation marks and citations omitted), *aff'd*, 762 F.3d 165 (2d Cir. 2014). This has "always been the law in New York." *Septembertide Publ'g, B.V. v. Stein & Day, Inc.*, 884 F.2d 675, 682 (2d Cir. 1989) (citing *Seibert v. Dunn*, 110 N.E. 447, 450 (N.Y. 1915)).

## C. The Licenses Can Coexist Without Conflict

There are multiple possible interpretations of the grant of rights in each license.

### 1. Scope of Exclusivity

The scope of "exclusivity" under each license is ambiguous. At a minimum, the following two interpretations of the grant of rights under each license are possible:

1. Under each license, only the licensee can use the intellectual property "for" or "in connection with" its restaurant(s). Others can use the intellectual property for other restaurants and other purposes.

2. Under each license, only the licensee can use the intellectual property—period. No one else can use the intellectual property *for any purpose*. However, the licensee may use the intellectual property only in connection with its restaurant(s).

The first interpretation is the better reading, because it does not require any rewriting of the language in the licenses. If the second interpretation had been the intent, the grant of rights could have easily been written as follows: "Licensor grants to Licensee an exclusive license to use the intellectual property. Licensee may use the intellectual property only in connection with Licensee's restaurant(s)."

The parties' course of conduct also supports the first interpretation. GFB has been using the intellectual property in question for many years (for its restaurant), and IM USA never claimed that this was a breach of its exclusive right to use the intellectual property.

Therefore, the Court finds that the "exclusive" grant of rights in each license was limited to use of the licensed property *for certain purposes*. That is, the GFB License permits GFB to use the trade name Il Mulino "for the [Original Restaurant]" (and no one else may use the trade name Il Mulino *for the Original Restaurant*), and the IM-III License permits IM-III (and now BSP) to use the Intellectual Property "in connection with the Restaurants" (and no one else may use the Intellectual Property *in connection with the Restaurants*). (*See* GFB License ¶ 3; IM-III License § 1.1.)

### 2. The "Restaurants" in the IM-III License

The IM-III License defines "Restaurants" as "additional IL MULINO NEW YORK restaurants and other restaurants." (IM-III License at 1.)[20] The parties dispute whether this definition includes the Original Restaurant.

---

[20]     In their supplemental brief, the Plaintiffs argued that the definition of Restaurants in the IM-III License includes every restaurant referenced in the entire "whereas" clause, including the restaurants to which the Licensor had previously licensed the Intellectual Property. (Pls. Supp. at 17.) However, construing the entire "whereas" clause as the definition of "Restaurants" is nonsensical, as the entire clause includes many words and phrases that are clearly not restaurants. If all of the restaurants referenced in the entire "whereas" clause were intended to fall within the definition of "Restaurants," the parenthetical should have read "(every restaurant referenced in this 'whereas' clause, a 'Restaurant')." Considering the way the "whereas" clause and the parenthetical is actually

25

While the IM-III License does not explicitly mention the GFB License, it does explicitly

mention the Original Restaurant.  In defining the term "Intellectual Property," the IM-III License

states that "Licensor is the valid and legal owner of [intellectual property] relating to . . . the

operation of the *Il Mulino restaurant* located at 86 West Third Street, New York, New York."

(*Id.* (emphasis added).)  The term "Restaurants," on the other hand, includes only "additional IL

MULINO NEW YORK restaurants and other restaurants."  (*Id.*)  The Court finds that there is no

ambiguity that the Original Restaurant is not an "additional IL MULINO NEW YORK

restaurant" under the IM-III License, because the agreement itself refers to the Original

Restaurant as an "Il Mulino restaurant."

At the trial, the Plaintiffs spent a great deal of time to show that the Original Restaurant

was, *in other contexts*, referred to interchangeably as "Il Mulino" and "Il Mulino New York."

However, Plaintiffs' argument depends on extrinsic evidence that the Court could only consider

if the IM-III License itself were ambiguous whether "additional IL MULINO NEW YORK

restaurants" included the Original Restaurant.  Nevertheless, even if the Court could consider

this evidence, and even if it were true that the Original Restaurant is *an* IL MULINO NEW

YORK restaurant, it is certainly not an "*additional* IL MULINO NEW YORK restaurant."

However, there is an ambiguity about which restaurants are included within the term

"other restaurants."  The term "other restaurants," at first glance, appears to be a very broad

catchall.  The Plaintiffs asserted at closing argument that the reference to "other restaurants"

simply means "any restaurant."  However, if that were the intended meaning, there would be no

---

written, only as much of the preceding language that could logically constitute a definition of "Restaurants" should
be included in the definition, i.e., "additional IL MULINO NEW YORK restaurants and other restaurants."

At closing argument, the Plaintiffs changed their argument, arguing that the term "Restaurants" does not
include the word "additional," and includes only the words *after* the word "additional," such that it would
encompass any and all restaurants.  The Court similarly rejects this reading for the reasons explained below.

need for a defined term for "Restaurants," as the "whereas" clause could have simply read "to develop, operate and/or franchise restaurants," and references to "the Restaurants" could have been to "restaurants" in general.  There would also be no reason for the apparent distinction between "additional IL MULINO NEW YORK restaurants" and "other restaurants."  The reference to "other restaurants" was apparently intended to include restaurants using concepts other than "IL MULINO NEW YORK," such as "Prime," "Bistecca," and "Trattoria," which do not include the Original Restaurant.

Moreover, in the context of the entire "whereas" clause, it becomes clear that the term "Restaurants" (and therefore the term "other restaurants") should only include restaurants that the Licensee would "develop, operate, and/or franchise."  It is undisputed that GFB—and not IM-III, IM USA, or any of the Plaintiffs—operated the Original Restaurant.  As noted by the Plaintiffs themselves:

- "Defendant GFB Restaurant Corp. ('GFB') is a New York corporation that operates a restaurant at 86 West Third Street, New York, New York."  (Complaint ¶ 35.)

- "As set forth in its operating agreement, the 'purpose' of IM-III is 'to . . . own and operate restaurants . . . *other than* the IL Mulino New York restaurant located at 86 West Third Street . . . .'"  (Pls. Br. at 19 (quoting IM-III Operating Agreement, Pls. Ex. 16, § 2.1) (emphasis added).)

- IM USA "was formed . . . to serve as the actual licensing and management company for **_new_** *Il Mulino franchises and restaurants*."  (*Id.* at 20 (emphasis added).)

Therefore, the Original Restaurant is not included in the term "other restaurants," and since the Original Restaurant is not within either the term "additional IL MULINO NEW YORK

restaurants" or "other restaurants," it is not within the term "Restaurants" as defined in the IM-III

License.[21]

### 3.  The Territorial Restriction in the GFB License

The GFB License states that it "may be used only in the Territory," which is defined as

"the restaurant located at 86 West Third Street, New York, New York."  (GFB License ¶ 3.)[22]  If

this territorial restriction applies to advertising, then GFB would have no right under the GFB

License to advertise outside of the Original Restaurant.

The GFB License does seem to allow for the use of the trade name Il Mulino for

advertising for the Original Restaurant.  While advertising is not specifically stated as a

permitted use of the trade name, the GFB License broadly permits GFB "to use Licensor's trade

name of Il Mulino for the restaurant located at 86 West Third Street . . . ."  (*Id.* ¶ 3.)  Advertising

is certainly a "use of Licensor's trade name of Il Mulino," and, therefore, the specific permission

to advertise would be superfluous.  *See* 15 U.S.C. § 1127 ("[A] mark shall be deemed to be in

use in commerce . . . on services when it is used or displayed in the sale or *advertising* of

services and the services are rendered in commerce . . . ." (emphasis added)).

In addition, the GFB License requires consent by the Licensor before GFB engages in

any advertising, which supports the interpretation that GFB is permitted to advertise under the

GFB License, although IM-I must first approve the specific advertisement:

---

[21]     The Plaintiffs also argue that the phrase "Licensor has previously licensed the Intellectual Property in connection with the operation of IL MULINO NEW YORK restaurants" references only the licenses in Exhibit A to the IM-III License (which include only the licenses for the Dallas and Tokyo restaurants).  However, if this were the intended meaning, the language could have simply read "Licensor has previously licensed the Intellectual Property *in the licenses included in Exhibit A*."  Furthermore, even if only the Dallas and Tokyo restaurants were meant to be referenced in that phrase, the "whereas" clause does not state that "Licensor has previously licensed the Intellectual Property *only* in connection with the operation of [the Dallas and Tokyo] restaurants."

[22]     It is also possible that the definition of "Territory" only includes "86 West Third Street, New York, New York" (i.e., it does not include "the restaurant located at").  The difference could be significant if, for example, the address includes the land surrounding the building, while "the restaurant" includes only the building.  Such a distinction is not relevant to this opinion.

> **8. Prohibited Use of Trademark.** Licensor's trade name and trademark will be used only in the manner provided by Licensor. It will not be used by Licensee in any form of advertising unless Licensee has first obtained Licensee's[23] written consent to the specific use.

(GFB License ¶ 8.)  The GFB License also indicates that GFB must cease use of the trade name

and mark upon termination of the agreement, including in advertisements, which would be

unnecessary if the GFB License did not allow for use of the trade name in advertisements in the

first place:

> **11. Effect of Termination of Agreement.** Upon the termination of this Agreement for any reason, Licensee will immediately stop the use of Licensor's trade name and mark in any and all forms, including signs, menus, advertisements, logos, etc.

(*Id.* ¶ 11.)

As the GFB License therefore allows for advertising (with a requirement of IM-I's

consent to the specific advertisement), the question becomes whether the territorial restriction

applies to advertising.  Such a restriction would be nonsensical, as it would mean that GFB could

only advertise within the Original Restaurant.  This would effectively mean that GFB could not

advertise, which would make the GFB License internally inconsistent.  As noted by the Plaintiffs

themselves, "[i]n interpreting a contract, 'the entire contract must be considered, and all parts of

it reconciled, if possible, in order to avoid an inconsistency.'"  (Pls. Supp. at 17 (quoting

*Morse/Diesel, Inc. v. Trinity Indus., Inc.*, 67 F.3d 435, 439 (2d Cir. 1995)).)  Here, it is possible

to reconcile the license with itself by interpreting the permission to use the trade name for

advertising as an implied exception to the territorial restriction.

---

[23]      Defendants note that "[t]his is clearly a typographical error and is meant to say 'Licensor's.'"  (Defs. Supp. at 10 n.4.)

To the extent that either the permission to advertise or the applicability of the territorial restriction to advertising is ambiguous from the text of the license, the Court should look to extrinsic evidence to determine whether the territorial restriction was intended to cover advertising. GFB has been advertising its restaurant (outside of the restaurant) for the past twenty years, with no protest from anyone before this lawsuit. Therefore, the Court concludes that the GFB License was intended to permit such advertising.

4. Domain Names

As the GFB License allows for use of the trade name Il Mulino for advertising (outside of the Original Restaurant), the same is true for the use of domain names.

The only differences between the trade name Il Mulino and the domain name ilmulino.com is the lack of a space between "Il" and "Mulino" and the top-level domain identifier of ".com." Courts disregard such differences when evaluating the similarity of marks, as "[i]t is necessary in the registration of an internet address to eliminate spaces and . . . to add a top-level domain at the end of the address." *TCPIP Holding Co. v. Haar Commc'ns, Inc.*, 244 F.3d 88, 101 (2d Cir. 2001); *see also* 1 MCCARTHY ON TRADEMARKS & UNFAIR COMPETITION § 7:17.50 ("Courts and the Trademark Board agree that a gTLD[24] will usually have no trademark significance.").

Furthermore, in the Second Circuit, the use of a trademark in a domain name automatically constitutes use of the mark "as a mark." *TCPIP*, 244 F.3d at 104; *see also* 5 MCCARTHY ON TRADEMARKS & UNFAIR COMPETITION § 25A:42 ("The Second Circuit has gone the farthest of any court and has held that any use of a word as a domain name is use as a 'mark' and is not eligible for the fair use defense.") (citing *TCPIP*, 244 F.3d at 104). In *TCPIP*, the

---

[24]     "gTLD" means "generic top-level domain," e.g., ".com."

Second Circuit found that the defendant's use of the domain name "thechildrensplace.com" was use of the plaintiff's trademark ("The Children's Place") as a mark.  (Notably, the plaintiff did not have a trademark for "thechildrensplace.com," but only "The Children's Place.")  Therefore, the use of the domain name did not qualify for the fair use defense that would have allowed the defendant to use the mark despite another's exclusive right to use the mark, as one of the requirements for the fair use defense is that the mark be used "otherwise than as a mark" and used "only to describe the goods or services."  15 U.S.C. § 1115(b)(4).  The court affirmed the preliminary injunction issued against the defendant under the Lanham Act (for infringement) as to its use of the domain names that were sufficiently similar to the plaintiff's mark ("The Children's Place") as to cause a genuine likelihood of confusion among consumers.[25]

Accordingly, as a general matter, a license that grants the use of a trade name also grants the use of that trade name as a domain name.  While this may not be the case where the license contains a territorial restriction,[26] the territorial restriction in the GFB License was not intended

---

[25]    The Ninth Circuit takes a different view and requires the use of the domain name to be a "commercial use" of the mark in order for the use of the name to be use "as a mark."  Under this view, if the domain name directed the user to a blank website, then the domain name would arguably not be use of the name as a mark.  *See, e.g.*, *TrafficSchool.com, Inc. v. Edriver Inc.*, 653 F.3d 820, 833–34 (9th Cir. 2011) ("Until a domain name is associated with a server that hosts a website, it's not visible to consumers and thus can't possibly confuse them."); *GoPets Ltd. v. Hise*, 657 F.3d 1024, 1035 (9th Cir. 2011) ("Registration of a domain name without more does not constitute service mark or trademark infringement.").

However, even if commercial use of the name were required in this Circuit, the website that one is directed to when typing "ilmulino.com" into a browser (i.e., the website for Il Mulino restaurants) clearly shows that "ilmulino.com" is a commercial use of the mark.  A leading treatise gives the following quite applicable example:

> Thus, commercial web sites such as an accounting firm home page or *a web site for a chain of quick service restaurants* would qualify either as a form of advertising of the underlying services or as a rendering of information services and thus be subject to the Lanham Act.

5 MᴄCᴀʀᴛʜʏ ᴏɴ Tʀᴀᴅᴇᴍᴀʀᴋs & Uɴꜰᴀɪʀ Cᴏᴍᴘᴇᴛɪᴛɪᴏɴ § 25A:42 (emphasis added).

[26]    *See Hard Rock Cafe Int'l (USA) Inc. v. Morton*, No. 97 Civ. 9483 (RPP), 1999 WL 717995 (S.D.N.Y. Sept. 9, 1999); *Hard Rock Cafe Int'l (USA) Inc. v. Morton*, No. 97 Civ. 9483 (RPP), 1999 WL 701388 (S.D.N.Y. Sept. 9, 1999).

to apply to advertising, as explained above.  As the use of a domain name is a form of advertising, the territorial restriction should also not apply to the use of domain names.

Again, to the extent that there is any ambiguity in the contract whether it grants the use of domain names, or whether the territorial restriction applies to the use of domain names, the parties' conduct for almost the past twenty years (before this lawsuit) clearly shows that the intent was to allow GFB to use domain names with no territorial restriction.

5.  Sharing the Use of the Domain Names

While there may be practical issues with respect to shared use of domain names—in particular, ilmulino.com—it is not clear that the grant of licenses to two parties for use of a domain name for distinct purposes presents a legal issue.

Here, IM-I has licensed use of ilmulino.com to both GFB and IM USA for use in connection with their respective restaurants.  Therefore, both can make edits to the website that relate to their respective restaurants, and both have a right to be listed on the website, including on the homepage.  Conversely, neither has a right to make edits to the website that relates to the other's restaurants.  Therefore, party A's hypothetical attempt to make the links for party B's restaurant impracticably small would both be an act outside of party A's license, as well as an act that potentially tortiously interfered with party B's rights under its license.  Presumably, edits that relate to both parties' restaurants (e.g., the background color for the website) should only be made if both parties consent to the edit, although IM-I appears to have the final say in such matters due to the quality control measures in each license.

The Defendants note that the parties have already reached a workable solution to the issue of a shared website:

> GFB and IM USA have been coexisting and collaborating on the content of the website and shared used of the domain names for almost twenty years.  Plaintiffs and GFB (with oversight by IM1)

32

have been continuing that arrangement since the Consent Order [Dkt. No. 24] (the "Consent Order") was entered in this case on February 5, 2021. A continuation of the procedures in the Consent Order is a workable solution.

(Defs. Supp. at 11.) The Defendants are even willing to go so far as to have a separate website for the Original Restaurant, with only a link on the homepage of ilmulino.com:

> In the alternative, another practical solution would be to have the "homepage" of the current Il Mulino website could simply contain a prominent link to direct consumers looking for the Original Il Mulino Location to a separate website controlled by GFB under a separate domain name (owned by GFB, IM1, IM2 or an affiliate), in the same size, manner and location on the homepage as the links to the other Il Mulino New York locations. GFB would operate its website and Plaintiffs would then operate its website, subject to Section 4.1 and 4.2 of the IM3 License.

(*Id.*)

The Plaintiffs argue that the only workable solution "would be for GFB to acquire from Plaintiffs a sublicense to use the Il Mulino Domains pursuant to Plaintiffs' exclusive right to sublicense any rights to use the Il Mulino Intellectual Property." (Pls. Supp. at 23.) However, this is based on the Plaintiffs' reading of the IM-III License as an exclusive license to use the Intellectual Property *for any purpose*, or at least an exclusive license for use of the Intellectual Property in connection with certain restaurants *including the Original Restaurant*. This reading is incorrect, as section 1.3 of the IM-III License provides:

> 1.3. <u>Assignable Rights</u>. Licensee may transfer, sublicense and/or assign all or part of *the rights granted by this License* to a third party without the consent of Licensor.

(IM-III License § 1.3 (emphasis added).) The "rights granted by this License" include only the right to use the Intellectual Property *in connection with the Restaurants* (as defined in the IM-III License) *and products*. (*Id.* § 1.1.) The "rights granted by this License" did not include the right to use the Intellectual Property *for the Original Restaurant*. Therefore, the Plaintiffs have no

right to sublicense any of the Intellectual Property to GFB *for use in connection with the Original Restaurant*.

While the parties may have future disputes whether a certain use of the website is permitted under the licenses, or whether the parties have complied with the quality control provisions in the licenses, this Court will not speculate on the merits of such future disputes which if not consensually resolved would have to be adjudicated in non-bankruptcy court. The Stipulation the parties negotiated, and the Court approved, appears to provide a workable solution, but the Court will not impose the long-term adherence to the terms of the Stipulation that the parties negotiated as an interim standstill while this litigation proceeded to trial. The parties may well have trouble "living together" in the shared use of the domain name, email addresses, and website, but it is a result of two separate licenses which the Court has concluded can coexist (if not easily). Until the section 363 sale, Mr. Katzoff was essentially on all sides of the relationships, making it easy to coexist; that is no longer true. The parties can either negotiate a better consensual solution to their problems, or they will be forced to live with, in effect, "shared custody" of intellectual property rights. BSP shouldn't lose sight of the fact that substantial "good will" value of the trade name and mark is derived from the Original Restaurant. The value of what BSP acquired has been enhanced by association with the name and mark and it can continue to benefit by the association.[27]

### D.  The Plaintiffs' Claims for Breach of the IM-III License Fail

As the GFB License and the IM-III License do not overlap and can coexist, the grounds for a breach of the IM-III License are rather limited. The Plaintiffs allege "four distinct"

---

[27]     BSP made no effort to establish damages by showing that the value of its license was somehow harmed by the continuing association with the Original Restaurant. It is doubtful that such a showing could have been made.

breaches of the IM-III License.  (Pls. Br. at 57.)  The Court concludes that nearly all the claims

for breach fail.  However, where there actually was a breach, the Plaintiffs are entitled only to

nominal damages.

> 1. Grant and Continuation of the Original GFB License

First, the Plaintiffs argue that IM-I breached the IM-III License "from the date that

license was executed to today as a result of IM-I's ongoing purported licensing to GFB of the Il

Mulino trade name."  (*Id.*)  Section 1.2 of the IM-III License does indeed prohibit IM-I from

"licens[ing] . . . the Intellectual Property":

> 1.2   No Reservation of Rights.   Upon execution of this
> Agreement, Licensor shall have no rights to use, license, assign or
> transfer the Intellectual Property during the Term, unless the
> Agreement is terminated pursuant to Paragraph 6.2.

(IM-III License § 1.2.)

Contrary to the Plaintiffs' claim that there is a "continuing breach" of Section 1.2 due to

IM-I's "ongoing purported licensing," the Court finds that the better reading of Section 1.2 is

that it only restricts the active grant of a license; it does not restrict IM-I from passively allowing

an existing license to stay in force.  To the extent the language is ambiguous on this point, the

fact that no party had objected to the continuation of the GFB License for nearly twenty years

shows that the passive continuation of the GFB License was not intended to be a breach of

Section 1.2.  Therefore, the Court concludes that Section 1.2 is only breached by the active grant

of a license.

Moreover, under New York law, the alleged breach is not one that would properly be

considered a "continuing breach."  Instead, the grant of the GFB License, *even if* it were a breach

of Section 1.2, is viewed under New York law as "a single breach—with damages increasing as

the breach continued," rather than a "continuing breach."  *Maloul v. New Colombia Res., Inc.*,

No. 15 CIV. 8710 (KPF), 2017 WL 2992202, at *5 (S.D.N.Y. July 13, 2017) (quoting *Henry v. Bank of Am.*, 48 N.Y.S.3d 67, 70 (1st Dep't 2017)); *see also Kahn v. Kohlberg, Kravis, Roberts & Co.*, 970 F.2d 1030, 1041 (2d Cir. 1992) (explaining that plaintiffs could not use continuing wrong theory for "ongoing" violation, because "performance under the contract merely affects damages and does not give rise to a new cause of action").

Therefore, the original grant of the GFB License could not possibly be a breach of Section 1.2, as it occurred before the execution of the IM-III License; the Defendants could not have breached Section 1.2 when the GFB License was granted, as Section 1.2 did not yet exist.

### 2.   Representation and Warranty Regarding Prior Licenses

The Plaintiffs argue that "IM-I breached the IM USA License at execution by violating its representation and warranty that it had 'not previously granted any rights to any third party which are inconsistent with the License herein.'"  (Pls. Br. at 57 (quoting IM-III License § 5.1.1).)  However, as explained above, the GFB License and the IM-III License do not overlap; the GFB License only grants rights to use the name "Il Mulino" *for the Original Restaurant*, and the IM-III License only grants rights to use the Intellectual Property *for additional Il Mulino restaurants*.  Therefore, the rights granted under the GFB License were not contrary to the representation and warranty that IM-I had "not previously granted any rights to any third party which are inconsistent with" the IM-III License.

### 3.   Extensions and Amendments to the GFB License

The Plaintiffs argue that

> IM-I committed additional breaches of Sections 1.1–1.3 of the IM USA License when it: (i) modified and re-affirmed the GFB License in 2005; (ii) failed to terminate, and instead renewed and extended the term of that license in 2012; and (iii) purported to grant GFB additional rights in the 2020 GFB License Amendment.

(Pls. Br. at 57.)

### a. Section 1.1

The 2005 Amendment made only one change to the GFB License, which was to reduce the licensing fee from 15% to 5%. The 2005 Amendment did not change or expand GFB's rights to use the property licensed under the GFB License.

The extension of the GFB License in 2012 similarly did not result in any change or expansion of GFB's rights to use the property licensed under the GFB License.

As noted above, there is no conflict between the rights granted under the original GFB License and the rights granted under the IM-III License. Therefore, neither the 2005 Amendment nor the extension of the term in 2012 resulted in a breach of Section 1.1, as there is no overlap between the GFB License (either as amended in 2005 or as extended in 2012) and the IM-III License.

On the other hand, the rights granted by the 2020 Amendment conflict with the IM-III License, and the 2020 Amendment was therefore a breach of the "exclusive . . . right and license to use the Intellectual Property in connection with the Restaurants and . . . products . . . ." (IM-III License § 1.1.) But IM-I and GFB rescinded the 2020 Amendment in its entirety on May 24, 2021, before GFB acted on it to the detriment of BSP. (2021 Amendment.) The Plaintiffs have not proven that the Defendants acted on any of the expanded rights or were otherwise damaged by the breach of Section 1.1. The Plaintiffs are therefore entitled to only nominal damages for the breach.

### b. Section 1.2

As noted above, Section 1.2 only prohibits the active grant of a license. The 2005 Amendment is only a reduction of the licensing fee in the pre-existing GFB License, and therefore did not constitute a breach of Section 1.2.

The extension of the GFB License in 2012 is a closer question.  However, the Court finds that, as the extension was automatic under the original GFB License (unless either party decided not to continue the license), the extension was not an active grant of a license that would constitute a breach of Section 1.2.[28]

However, even if the 2005 Amendment or the 2012 extension were breaches of Section 1.2, the breaches occurred at the time of the amendment and the extension; they are not "continuing breaches."  Accordingly, a claim for breach of Section 1.2 due to the 2005 Amendment and the 2012 extension are barred by the six-year statute of limitations for breach of contract actions under New York law.

On the other hand, the 2020 Amendment so dramatically expanded GFB's rights under the GFB License that it was essentially equivalent to a new license for the expanded rights.[29] However, again, the Plaintiffs have not shown that the Defendants acted on any of the expanded rights before the 2020 Amendment was rescinded.  The Plaintiffs are therefore entitled to only nominal damages.

---

[28]     Paragraph 4 of the GFB License provides:

> **4. Term of Agreement – Extensions.**  The term of this Agreement shall be ten years commencing with the date of this Agreement.  The term will be automatically extended for an additional ten years unless either party notifies the other of its intention not to continue the Agreement in force for the extended term. This notice must be in writing, addressed to the address given above for the party to be notified, mailed by certified or registered mail, and posted no later than six months before the end of the original term of this Agreement.

(GFB License ¶ 4.)  Viewed differently, the original GFB License had a 20-year term, terminable after 10 years if either party notified the other of its intention not to extend the term.  The 2020 Amendment, rescinded on May 24, 2021, would have extended the term of the GFB License until September 23, 2042.  But as already indicated, the Court does not reach the issue whether IM-I can extend the term of the GFB License beyond September 23, 2022.

[29]     The expanded rights included "allow[ing] the use of the Intellectual Property in the development of additional restaurants and the development, manufacture, sale and distribution of products, including sauces and foods, pursuant to the terms of this license."  (2020 Amendment ¶ 1.)

c.  *Section 1.3*

Section 1.3 only allows the Licensee under the IM-III License to "transfer, sublicense and/or assign all or part of the rights granted by this License to a third party without the consent of Licensor."  (IM-III License § 1.3.)  There is no evidence that the Defendants prevented the Plaintiffs from exercising their authority under this section.  Moreover, as noted above, Plaintiffs only had the right to sublicense "the rights granted by this License," which did not include the right to use the Intellectual Property *in connection with the Original Restaurant*.  Therefore, a sublicense from the Plaintiffs to GFB to use the Intellectual Property *in connection with the Original Restaurant* would have been outside of the authority granted by Section 1.3.

Accordingly, the Court concludes that the Defendants did not breach Section 1.3 of the IM-III License.

### 4.  Refusal to Cooperate with Prosecution of an Infringement Claim

The Plaintiffs argue that IM-I also breached Section 3.3 of the IM-III License by "refusing to cooperate with Plaintiffs in prosecuting GFB's (and potentially IM-II's) infringement of Plaintiffs' exclusive rights to use the Il Mulino Intellectual Property."  (Pls. Br. at 57.)  Section 3.3 provides:

> 3.3.  Infringement of the Intellectual Property.  Licensee shall promptly notify Licensor in writing of any known or suspected infringement of the Intellectual Property.  Subject to the terms hereof, Licensor shall have the exclusive right to take action or institute proceedings with respect to such infringement, and shall proceed as it may, in its sole discretion.  Licensee shall reasonably cooperate in any such infringement action or proceeding by Licensor, at Licensor's expense.  If Licensor elects not to take action or fails to diligently prosecute such action, Licensee may take such action at the Licensee's expense.  In this event, Licensor shall cooperate as necessary in such action with the Licensee including, without limitation, joining as a party.  In such case, Licensor and Licensee shall each pay their own respective costs and fees.

(IM-III License § 3.3.)

However, even if the Defendants did not cooperate in the Plaintiffs' infringement action, the Plaintiffs' infringement action against the Defendants was entirely without merit, because GFB acted entirely within the scope of its license and therefore cannot be an infringer. *See* 3 MCCARTHY ON TRADEMARKS & UNFAIR COMPETITION § 18:44.50 (noting that licensees that use trademarks under licenses from the trademark owner "cannot be 'infringers'"). Accordingly, it was not "necessary" for the Defendants to join in the action, and therefore the Defendants did not breach Section 3.3. Moreover, even if Section 3.3 were breached, the Plaintiffs have not proven any damages as a result of any breach of Section 3.3.

5.   Anticipatory Breach by the Post-Closing Letters

Finally, even if the stated intent to remove the Plaintiffs from the websites in the Post-Closing Letters constituted an anticipatory breach of the IM-III License,[30] the Plaintiffs have not shown any damages from such a breach. Furthermore, such a claim was not included in the Second Amended Complaint or listed as an issue to be tried in the Joint Pretrial Order.

**E.  Plaintiffs Have Not Proven Any Damages**

As noted above with respect to each alleged breach, the Plaintiffs have not proven any damages from any breach. This would also be true even if the licenses did conflict.

The Plaintiffs contend that "IM USA alone was entitled to receive royalty payments" for the intellectual property, so had IM-I "not breached the IM USA license, IM USA would have been entitled to receive all royalty payments GFB owed under the GFB License or a reasonably equivalent market rate." (Pls. Br. at 65.) The Plaintiffs submit a damages calculation based on

---

[30]     It is not clear what obligation in the IM-III License the Defendants would have breached by removing the Plaintiffs from the websites. Under the IM-III License, the right to use the Intellectual Property was granted upon execution (*see* IM-III License § 1.1); the IM-III License includes no explicit *obligation* of IM-I to continue to allow access to the websites. However, if IM-I prevented the Plaintiffs' exercise of their rights under the IM-III License, that may be a breach of the "implied good faith obligation not to do anything that would impair or destroy the value" of the Plaintiffs' rights. *See* 3 MCCARTHY ON TRADEMARKS & UNFAIR COMPETITION § 18:44.

the rate GFB owed under the GFB License (i.e., 5% of GFB's annual gross revenues), totaling $4,058,637.74, exclusive of interest.  (*Id.*; ECF Doc. # 74-1.)

This damages calculation is highly questionable.  As an initial matter, the parties to the GFB License did not actually intend the actual payment of fees.  Mr. Katzoff stated in his deposition that there was an "understanding for years that there would be no payments made." ("Katzoff Depo.," ECF Doc. # 74-2, at 118:16–17.)  Moreover, GFB and IM-I had the same owners, with the same proportional ownership (Pls. Br. at 27), and it was therefore inconsequential to the parties to the GFB License and the owners of the entities whether royalties were actually paid (and it is undisputed that no royalties were ever paid).

By contrast, GFB and IM USA have significantly different ownership.  A comparison of the ownership structure of GFB, IM-I, and IM USA is as follows:

| **GFB and IM-I:** | **IM USA:** |
|---|---|
| 40%: Katzoff & Galligan | 56.7% Katzoff & Galligan |
| 40%: Passive Investors | 43.3% Passive Investors |
| 20%: Masci Brothers | |

(*Id.*)

Therefore, any royalty payments from either GFB or IM-I to IM USA potentially would have been a means for Katzoff, Galligan, and the Passive Investors to siphon money away from the Masci Brothers.

Damages can be calculated following the "reasonable royalty" approach primarily outlined in *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970).  "The reasonable royalty theory of damages . . . seeks to compensate the patentee . . . for its lost opportunity to obtain a reasonable royalty that the infringer would have been willing to

pay if it had been barred from infringing." *Adrea, LLC v. Barnes & Noble, Inc.*, 227 F. Supp. 3d

303, 307 (S.D.N.Y. 2017) (ellipses in original) (quoting *AstraZeneca AB v. Apotex Corp.*, 782

F.3d 1324, 1334 (Fed. Cir. 2015)).  Although this approach is primarily used in patent

infringement cases, it is appropriate in breach of contract cases as well.  *See Agrigenetics, Inc. v.*

*Pioneer Hi-Bred Int'l, Inc.*, No. 1:08-cv-802-TWP-TAB, 2010 WL 4683936, at *2 (S.D. Ind.

Nov. 10, 2010).

A reasonable royalty may be calculated based on an established royalty, or it may be

derived from a hypothetical negotiation.  *On Track Innovations Ltd. v. T-Mobile USA, Inc.*, 106

F. Supp. 3d 369, 407 (S.D.N.Y. 2015) ("A 'reasonable royalty' is typically derived from a

hypothetical negotiation between the [two parties] when the infringement began.").

The Plaintiffs argue that IM USA would have secured a 5% royalty rate in a hypothetical

sublicense from GFB.  This argument fails for the following reasons.

First, the IM-III License only grants the Licensee the right to "transfer, sublicense and/or

assign all or part of *the rights granted by this License* to a third party."  (IM-III License § 1.3

(emphasis added).)  As explained above, the IM-III License did not grant the right to use the

Intellectual Property *in connection with the Original Restaurant*.  Therefore, the Plaintiffs have

no right to sublicense the use of any of the Intellectual Property *in connection with the Original*

*Restaurant*.[31]

Second, while existing royalties are generally strong evidence of reasonable royalties,

royalty rates under license agreements between related entities "do not prove a royalty rate

established by an arms-length transaction."  *Medtronic Sofamor Danek USA, Inc. v. Globus*

---

[31]    However, the Plaintiffs and IM-I could agree to amend the IM-III License to allow for a direct license from
IM-I to GFB.  The Plaintiffs would presumably seek compensation from IM-I for such an amendment, which may
be similar to the royalties the Plaintiffs would receive if they were able to sublicense the intellectual property
themselves.  Nevertheless, this amount has not been proven.

*Med., Inc.*, 637 F. Supp. 2d 290, 309–10 (E.D. Pa. 2009), *aff'd sub nom. Warsaw Orthopedic,*

*Inc. v. Globus Med., Inc.*, 416 F. App'x 67 (Fed. Cir. 2011).  Accordingly, the 5% rate owed by

GFB to IM-I is not strong evidence of a reasonable royalty.

Furthermore, the evidence shows that the sublicenses that were granted from IM USA to

Pasta Perfect, LLC, IMNY GS, LLC, Il Mulino Gramercy, LLC, and IMNY BOCA, LLC, were

"royalty-free."  (Pls. Exs. 73, 112, 124, 128.)  There is no reason to believe that GFB would have

paid a royalty rate *higher* than that owed by these other entities, particularly as the continued

operation of the Original Restaurant is essential to the value of the brand.

Finally, even if the Plaintiffs were entitled to damages, under New York law, where

monetary damages are sought for alleged continuing contractual breaches, "the plaintiff's

recovery must be limited to damages incurred within the six years prior to commencement of the

action."  *Garron v. Bristol House, Inc.*, 79 N.Y.S.3d 265, 268 (2d Dep't 2018) (citing

*Kaymakcian v. Bd. of Managers of Charles House Condo.*, 854 N.Y.S.2d 52 (1st Dep't 2008);

*Bulova Watch Co. v. Celotex Corp.*, 389 N.E.2d 130 (N.Y. 1979); *Westchester Cnty. Correction*

*Officers Benevolent Assn., Inc. v. Cnty. of Westchester*, 885 N.Y.S.2d 728 (2d Dep't 2009)); *see*

*also Henry v. Bank of Am.*, 48 N.Y.S.3d at 70 ("Where applicable, the [continuing wrong]

doctrine will save all claims for recovery of damages but only to the extent of wrongs committed

within the applicable statute of limitations.").

Accordingly, even if the Plaintiffs were entitled to damages, damages would be limited to

those incurred in the six years before the commencement of this adversary proceeding on

January 27, 2021.

### F.   An Injunction Is Not Warranted

A party seeking an injunction must show irreparable injury, which is "an injury that is not

remote or speculative but actual and imminent, and for which a monetary award cannot be

adequate compensation." *Dexter 345 Inc. v. Cuomo*, 663 F.3d 59, 63 (2d Cir. 2011).  As explained below, the Court views it as a close question whether the Plaintiffs are entitled to an injunction.

Here, both parties have a right to use certain intellectual property, including domain names, *for their respective restaurants*.  The question is whether, in addition to a declaratory judgment that clarifies the rights of the parties, the parties are entitled to an injunction against any interference with their rights to use the domain names *for their respective restaurants*.

First, the Plaintiffs themselves have indicated that, due to the Defendants' admission that the IM-III License permits the Plaintiffs to use the domain names, "Plaintiffs do not anticipate future direct harms that require financial or other remedies from the Court."  (Pls. Supp. at 52.)

In addition, the Plaintiffs have not shown that damages would be an inadequate remedy. While restriction of the use of a domain name may cause the Plaintiffs to lose business, the Plaintiffs would be able to calculate any such loss of business based on historical records and the records of comparable businesses during the period that they are unable to use the domain name. The Second Circuit's analysis in *Dexter 345 Inc. v. Cuomo*, 663 F.3d at 63, is directly on point. In that case, the Second Circuit concluded that the inability of a long-running business to continue operations as it had in the past was insufficient to show irreparable injury, reasoning that the business would be able to calculate damages that would be adequate to compensate the loss, including from lost profits and loss of goodwill, from its prior business records.  *Id.*

Moreover, while an injunction is the standard remedy for trademark *infringement*, that is because trademark infringement involves damage to business reputation and loss of the goodwill that the trademark represents, which is difficult to compensate with monetary damages:

> A likelihood of damage to reputation is by its nature "irreparable" in the legal sense.  Like trying to un-ring a bell, trying to

44

> "compensate" after the fact for damage to business goodwill and
> reputation cannot constitute a just or full compensation.

5 McCARTHY ON TRADEMARKS & UNFAIR COMPETITION § 30:1.

The usual rationale for an injunction in the trademark context does not apply here, even

aside from the fact that this is not a trademark infringement case, as the Defendants' use of the

mark has not caused any reputational damage to the Plaintiffs.  In fact, much of the value of the

mark comes from the Defendants' historical use of the mark.  In addition, any act by the

Defendants to prevent the Plaintiffs from using domain names would likely not affect the

Plaintiffs' reputation, but would rather simply lead to lost business, which can be remedied with

monetary damages.

The Plaintiffs, for the first time at closing argument, argued that an injunction would be

warranted to avoid consumer confusion, citing *Frisch's Restaurants, Inc. v. Elby's Big Boy of*

*Steubenville, Inc.*, 670 F.2d 642 (6th Cir. 1982).  This argument is misplaced, as likelihood of

confusion is the test for trademark infringement.  *See* 4 McCARTHY ON TRADEMARKS & UNFAIR

COMPETITION § 23:1.50 ("All courts, in analyzing a claim of infringement based on both federal

and state law, will apply a single analysis: the likelihood of confusion test.").  Therefore,

likelihood of confusion is wholly inapplicable, not only because the Plaintiffs have dropped their

claim for infringement, but also because GFB, if acting within the scope of its license, cannot be

an infringer.  *See* 3 McCARTHY ON TRADEMARKS & UNFAIR COMPETITION § 18:44.50 (noting

that licensees that use trademarks under licenses from the trademark owner "cannot be

'infringers'").

Any argument that the Plaintiffs might be harmed by the Defendants' future advertising

in competition with the Plaintiffs' restaurants is likewise misplaced, as there is no evidence in the

record of any agreement among the parties to this lawsuit not to compete, nor is there any

evidence in the record regarding the damages that the Plaintiffs would incur by such competition, let alone why any harm from such competition would be irreparable.  In addition, the parties did not raise in their papers—or list in the Joint Pretrial Order regarding the issues to be tried—the issue of whether the parties can compete with each other, which certainly could have been raised separately from issues regarding the right to use the Intellectual Property.  As there is no live controversy regarding the permissible scope of competition, the Court refrains from speculating which forms of competition by which parties would be permissible.

While declining here to grant BSP injunctive relief, the Court is very troubled that Mr. Katzoff (a non-practicing lawyer who should have known better) has at least twice acted to breach BSP's unassailable rights derived from the IM-III License and the Sale Order.  The first time there was a clear breach of the IM-III License occurred when Mr. Katzoff sought impermissibly to expand GFB's rights to use the trademark and domain names to develop additional restaurants and market products (*see* 2020 Amendment), rights that were exclusively granted to IM USA (and now BSP).  But Mr. Katzoff rescinded the 2020 Amendment before any damages resulted.  The second breach was the breach to the Sale Order (discussed above) when Mr. Katzoff threatened to strip BSP of its clear rights to use the ilmulino.com domain name and associated intellectual property rights.  Mr. Katzoff retreated from his threats without carrying them out.  But, as the Court commented during closing arguments, the Court doubts that this expensive adversary proceeding would have been filed if Mr. Katzoff had not made his threats to strip BSP of some of the valuable assets it acquired in the section 363 sale.  Do these circumstances support granting the exceptional remedy of an injunction?  Maybe so, but the Court declines to exercise its discretion to grant what it expects to be an unnecessary remedy.

Suffice it to say, if IM-I and Mr. Katzoff repeat their folly, the harshest remedy would be in order.

Accordingly, while both the Plaintiffs and the Defendants are entitled to a declaratory judgment clarifying their rights to use the intellectual property, it has not been shown that an injunction is necessary to avoid irreparable harm.

### G.  Prior Notice of the GFB License

Finally, the Court notes that the Plaintiffs have attempted to present a narrative in which Mr. Katzoff has hidden the GFB License—a supposedly secret license—from them, only to spring it upon them in an alleged post-sale ambush.  The Plaintiffs state in the Second Amended Complaint that "Defendants had never disclosed the existence or terms of the GFB License prior to the advent of this adversary proceeding."  (SAC ¶ 7.)  The Plaintiffs expanded on this allegation in their opening brief:

> At the commencement of this action, Plaintiffs did not know the predicate for Defendants' unlawful conduct – they just knew it was unlawful.  But this action has unearthed a secret, breaching license of the intellectual property, signed by Mr. Katzoff and himself on behalf of two non-Debtor entities each controlled by Mr. Katzoff— Defendant IM LLC-I ("IM-I") and Defendant GFB Restaurant Corp. ("GFB")—which license surfaced for the very first time as an attachment to Defendants' Answer (*see* ECF No. 35-1 (the "GFB License")).  This GFB License purports to allow GFB the use of the "trade name of Il Mulino" in direct breach of the IM USA License. As this Court is already aware, this GFB License was never disclosed during the course of the chapter 11 cases to the Court.  As the Court will hear at trial, this GFB License was also never disclosed to the Debtors in possession or BSP; moreover, in addition to the fact of the license being concealed, GFB has never paid a cent to IM I pursuant to this GFB License.

(Pls. Br. at 12.)

The evidence in the record shows that these allegations are simply false.  As already explained above, as part of BSP's due diligence before it extended its loan to the Debtors, it was

provided a report by Citrin Cooperman that disclosed that "[l]icensing fees are charged by IM1 to GFB . . . ." (Defs. Ex. O at 7.)  It is noteworthy that BSP offered no testimony of anyone who acted for BSP in the negotiations or due diligence in connection with the extension of credit.  If BSP had any witness who could have corroborated its allegation that the GFB License was not disclosed to it, it should have provided evidence to that effect.

And, again, as already explained, on June 30, 2020, Gerard Catalanello (the Debtors' counsel in the main case), wrote to Michael Goldstein (BSP's counsel in the main case), stating that "there is a direct license between IM LLC-I and GFB (it predates IM USA and was put in place when GFB was purchased many years before the BSP transaction)." (Defs. Ex. GG at 2– 3.)  This exchange of communications occurred months before the section 363 sale was approved by the Court.  No one raised this issue with the Court.

At trial, the Plaintiffs attempted to show that Mr. Katzoff had stonewalled attempts to obtain the GFB License, to which Mr. Katzoff replied:

> Brian Gallagher, who's our lawyer, had the documents since 2002. He was asked for it in November 19 [sic], I think, of 2020.  And he turned it over to them.  I had previously given it to Bill Heuer on October 30 of 2020 when everybody was asking for the document. So, I turned it over to Bill Heuer, who was my lawyer, and Brian Gallagher turned it over to Alston & Bird.

("Transcript," ECF Doc. # 92, at 147:3–9.)

However, *even if* Mr. Katzoff had stonewalled, and BSP had not obtained a copy of the GFB License before the sale, BSP knew of its existence and proceeded with the sale anyway, knowing that they had an incomplete picture of "all of the pieces to this puzzle," as Mr. Catalanello put it.

In short, the Court concludes that Plaintiffs' trial counsel actively promoted a false narrative. The record convinces the Court that the Plaintiffs cannot credibly argue that the wool was pulled over their eyes.

## VI.   COUNT V: INFRINGEMENT

The Plaintiffs have dropped this claim. (Pls. Reply at 21.)

## VII.   COUNT VI: FRAUDULENT TRANSFER UNDER N.Y. D.C.L. §§ 273, 274, AND 276

The Plaintiffs argue that IM USA has standing as a creditor of IM-I to assert fraudulent conveyance under New York Debtor & Creditor Law ("DCL"). To have standing to allege a fraudulent conveyance claim under DCL § 273, a plaintiff must demonstrate that it was a "creditor" whose claim arose *before* or *after* the transfer was made. DCL § 273. To have standing to allege a fraudulent conveyance claim under DCL § 274, a plaintiff must demonstrate that it was a "creditor" whose claim arose *before* the transfer was made. *Id.* § 274. A "claim" is "a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured." *Id.* § 270(c).

In the Second Amended Complaint and the Plaintiffs' Opening Brief, the Plaintiffs allege that IM USA was a creditor of IM-I because of its unliquidated claim relating to IM-I's breach of the IM-III License. It fails to give any detail as to what unliquidated claim provides IM USA with standing as a creditor. The Plaintiffs' Supplemental Brief provides a number of theories, all of which must fail.

First, the Plaintiffs contend that IM USA was a creditor by virtue of its position as assignee of the IM-III License because it held a contingent claim against IM-I. However, the Plaintiffs fail to point to any part of the IM-III License giving it a "right to payment" from IM-I.

Any theory that it held a contingent claim for an unliquidated claim relating to the breach also fails.[32]  In determining if a breach of contract claim arose before the conveyance, New York courts look at the time at which the breach of contract claim accrued.  *See Bd. of Managers of Chocolate Factory Condo. ex rel. Chocolate Factory Condo. v. Chocolate Partners, LLC*, 992 N.Y.S.2d 157 (N.Y. Sup. Ct. 2014).  Under New York law, a claim for breach of contract accrues at the time of the alleged breach rather than at the time of execution of the agreement. *Ely-Cruikshank Co. v. Bank of Montreal*, 615 N.E.2d 985, 986 (N.Y. 1993) ("In New York, a breach of contract cause of action accrues at the time of the breach.").

Next, the Plaintiffs argue IM-I committed numerous breaches of the IM-III License, mostly based on events occurring before the execution of the 2020 Amendment on April 5, 2020. (*See* Pls. Br. at 57–64) (describing instantaneous and continuing breach because of conflicting license to GFB in 2004; breach of representation of no previous, inconsistent grant in 2004; amended and new GFB License in 2005; and extended and new GFB License in 2012)). However, most of the alleged breaches are clearly barred by the six-year statute of limitations.

The only claim that is not barred by the statute of limitations is the alleged breach by the 2020 Amendment itself.  That alleged breach arises simultaneously out of the same transaction underlying the fraudulent transfer claim—the 2020 Amendment.  However, the Plaintiffs have

---

[32]   A "contingent claim" still has limits:

> The expansive definition of claim and its legislative history "surely points us in a direction, but provides little indication of how far we should travel [in delimiting a contingent claim]."  After all, a contingent right to payment is, by definition, a right to payment that, because it is contingent, is not yet and may never be a right to payment.  In the strangely appropriate language of philosopher Martin Heidegger, it might be said to exist somewhere on a continuum between being and nonbeing.  At some point on that continuum, a right to payment becomes so contingent that it cannot fairly be deemed a right to payment at all.

*In re CD Realty Partners*, 205 B.R. 651, 656 (Bankr. D. Mass. 1997) (quoting *In re Chateaugay Corp.*, 944 F.2d 997, 1003 (2d Cir. 1991)).  Under the circumstances of this case, the Plaintiffs' argument that there is a contingent claim of an unliquidated claim is too contingent and cannot be deemed a right to payment at all.

not offered any authority to support that the breach of contract by the 2020 Amendment gave IM

USA standing as a pre-existing creditor.  In fact, New York law appears to reject the argument

that one can obtain standing for a fraudulent conveyance claim in the same transaction giving

rise to the fraudulent conveyance claim.  *See Harris v. Coleman*, 863 F. Supp. 2d 336, 343

(S.D.N.Y. 2012) (dismissing a New York fraudulent conveyance claim because the plaintiffs

"ha[d] not alleged any [independent,] pre-existing tort claim" and "their status as 'tort creditors'

[wa]s based on the alleged fraudulent conveyance itself"); *Refco Grp. Ltd., LLC v. Cantor

Fitzgerald, L.P.*, No. 13 CIV. 1654 RA, 2014 WL 2610608, at \*44 (S.D.N.Y. June 10, 2014)

(finding that a single transaction giving rise to the creditor-debtor relationship could not also give

rise to a New York fraudulent conveyance claim because there could be no fraudulent

conveyance of anything with the intent to frustrate a creditor's ability to recover a judgment

against them).  A claim that arises simultaneously with a fraudulent transfer claim does not

constitute a pre-existing claim.  *See Breeden v. L.I. Bridge Fund, L.L.C. (In re Bennett Funding

Grp., Inc.)*, 220 B.R. 739, 742 (2d Cir. BAP 1998) (finding the phrase "owed by the debtor when

the transfer was made" in 11 U.S.C. § 547(b)(2) means that "at the time of the transfer there was

a recognizable 'claim' that was: (1) against the debtor, rather than only against a third party, and

(2) that was pre-existing, rather than one which arose simultaneously with the transfer"); *see also

In re Garcia*, 494 B.R. 799, 811–14 (Bankr. E.D.N.Y. 2013).  Nor does it seem to arise after the

transaction.  In fact, the Plaintiffs have not argued that they have a claim that arises after the

alleged fraudulent transfer that would give them standing to assert their fraudulent transfer claim.

The claims for breach due to the 2020 Amendment arose *simultaneously* with the alleged

fraudulent transfer, and therefore fall outside of the scope of both sections 273 and 274.

Accordingly, IM USA lacks standing as a creditor, and the Plaintiffs' fraudulent conveyance

claims under the DCL fail.

## VIII. COUNT VII: FRAUDULENT TRANSFER UNDER 11 U.S.C. §§ 544, 548, AND 550

In contrast to Count VI, in Count VII the alleged roles are reversed, whereby IM-I is

alleged to be a creditor of IM USA, the debtor.

In their Supplemental Brief, the Plaintiffs argue that the 2020 Amendment was a transfer

of *IM-I's property* for two reasons: (1) IM-I released its right to royalty payments that were

already accrued and that were otherwise to be accrued prospectively; and (2) IM-I granted GFB

the right to use intellectual property owned by IM-I that GFB previously had no right to use.

However, these arguments are only relevant to Count VI (which fails as explained above). As to

Count VII, the Plaintiffs must demonstrate a fraudulent transfer of *IM USA's (the debtor's)*

*property*.

The Plaintiffs additionally argue that

> the 2020 GFB License Amendment also constituted a transfer of *IM
> USA's property*, because IM USA was the exclusive licensee of the
> Il Mulino Intellectual Property and the 2020 GFB License
> Amendment *purported* to license certain of that intellectual property
> to GFB. And under section 548, IM USA was provided the right to
> "avoid any transfer . . . of an interest of the debtor in property." 11
> U.S.C. § 548.

(Pls. Supp. at 39 (emphasis added).) The alleged "purported" transfer is not enough under

section 548. The trustee or debtor-in-possession may only avoid *actual* transfers of an interest of

the debtor in property. *Trauner v. SEICO, Inc. (In re Carter Bros. Sec. Servs., LLC)*, No. 18-

61490-JWC, 2021 WL 1157896, at *2 (Bankr. N.D. Ga. Mar. 25, 2021) ("In the instant case,

there are no actual transfers to consider against the Complaint or § 548—there are only

hypotheticals. Without any actual transfers to consider, Trustee puts the cart before the horse.").

Even if there was an actual transfer by the 2020 Amendment, it cannot be avoided because the 2020 Amendment has already been rescinded.

The cases Plaintiffs cite in support of the proposition that a grant of a license by a non-debtor that has the effect of devaluing a license held by a debtor constitutes a fraudulent transfer are irrelevant here. *Argyle Online, LLC v. Nielson (In re GGW Brands, LLC)*, 504 B.R. 577 (Bankr. C.D. Cal. 2013) is easily distinguishable. That action arose from certain *assignments* of intellectual property that the debtors owned that left the debtors insolvent because the debtors all faced "massive litigation exposure" and lost their "most important asset" as a result of the assignments. *GGW Brands*, 504 B.R. at 603. Here, however, the 2020 Amendment (which is the alleged fraudulent transfer) merely licenses the use of trademarks and domain names.

The Plaintiffs fail to recognize the critical distinction between licenses and assignments in the trademark context. "An 'assignment' of a mark is an outright sale of all rights in that mark," and "a 'license' of a mark is a limited permit to another to use the mark." 3 MCCARTHY ON TRADEMARKS & UNFAIR COMPETITION § 18:1. A trademark "is a very unusual and delicate kind of property," and must be assigned in full or not at all. 1 MCCARTHY ON TRADEMARKS & UNFAIR COMPETITION § 2:15. "A trademark cannot be sliced up and ownership of pieces of it apportioned among independent entities." *Id.*; *see also Marshak v. Green*, 746 F.2d 927, 929 (2d Cir. 1984) ("[A] trademark cannot be sold or assigned apart from [the] goodwill it symbolizes."). Unlike an assignment, a trademark license is not a transfer of ownership rights in the trademark:

> A licensee's use inures to the benefit of the licensor-owner of the mark and the licensee acquires *no ownership rights* in the mark itself. . . .
>
> The licensee of a trademark is in the position of a renter of an apartment, who does not acquire real estate ownership rights, no matter how long the tenancy.

3 MCCARTHY ON TRADEMARKS & UNFAIR COMPETITION § 18:52 (emphasis added) (citing *City-Core Hospitality, LLC v. Palmer*, 2018 WL 398257, at *2 (N.D. Cal. 2018) ("The licensee is only renting the licensor's own goodwill.")).

While substance will prevail over form, and therefore an agreement titled "license" will be construed as an assignment where it is in fact an assignment, the GFB License and the 2020 Amendment are clearly licenses rather than assignments. The crucial question to determine whether a "license" is in fact a license or is instead an assignment is whether the license includes quality control measures. "If the trademark owner exercises reasonable control over the nature and quality of the licensee's goods or services," the agreement is a license, as "the benefits of the licensee's use accrue to the trademark owner." RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 33 & cmt. b (1995). The purpose of such quality control measures is to protect the goodwill that the trademark—which is owned by the licensor—represents. The GFB License includes quality control measures (*see, e.g.*, GFB License ¶ 7), which were not eliminated by the 2020 Amendment. The GFB License and the 2020 Amendment are therefore licenses rather than assignments.

The Plaintiffs argue that the New York fraudulent transfer statute states that the term "[t]ransfer . . . includes . . . license." (Pls. Br. at 69 (quoting DCL § 270(p)).) However, this does not mean that a license is *necessarily* a transfer. For example, an exclusive copyright license is a transfer of ownership rights in the copyright, but a trademark license is never a transfer of ownership rights in the trademark. Thus, an exclusive copyright license *can* be the basis for a fraudulent transfer claim, but a trademark license *cannot* be the basis for a fraudulent transfer claim based on transferred rights, because no ownership rights are transferred under a

trademark license.[33]  In the trademark context, ownership rights are only transferred in an

assignment, rather than a license.[34]

Accordingly, as the Plaintiffs have failed to show that anything was transferred under the

2020 Amendment, the Plaintiffs' claim that the 2020 Amendment constituted a fraudulent

transfer of IM USA's property fails.

## IX.  COUNT VIII: TORTIOUS INTERFERENCE WITH CONTRACT

In Count VIII of the Second Amended Complaint, the Plaintiffs allege that GFB, IM-II,

and Mr. Katzoff, by virtue of the 2020 Amendment, tortiously interfered with the IM-III License.

The Plaintiffs are no longer asking the Court to find IM-II liable for tortious interference because

there is no evidence in the trial record of IM-II being granted any rights from IM-I in breach of

the IM-III License.  (Pls. Supp. at 40.)

Under New York law, the elements of a claim for tortious interference with contract are:

> (1) "the existence of a valid contract between the plaintiff and a third
> party"; (2) the "defendant's knowledge of the contract"; (3) the
> "defendant's intentional procurement of the third-party's breach of

---

[33]     Two of the cases cited by the Plaintiffs—*Davis v. Blige*, 505 F.3d 90 (2d Cir. 2007) and *In re Golden Books Family Entertainment, Inc.*, 269 B.R. 311 (Bankr. D. Del. 2001)—concern exclusive copyright licenses. (*See* Pls. Supp. at 39.)  An exclusive copyright license does indeed transfer an ownership interest in the copyright. *Golden Books*, 269 B.R. at 319 (finding that, under applicable copyright law, exclusive licenses convey an ownership interest to the licensee that allows that licensee to freely transfer its rights).  But, as explained above, a trademark license (exclusive or not) does not transfer any rights in the trademark itself; it is simply a permit to use the trademark.

The *Telebrands* case cited by the Plaintiffs is similarly unhelpful to the Plaintiffs.  In that case, the court found that an exclusive trademark licensee may have a sufficient interest in the trademark for purposes of standing to bring a trademark infringement claim, by finding that the exclusive licensee was "effectively an assignee." *Telebrands Corp. v. Del Laboratories, Inc.*, 719 F. Supp. 2d 283, 293 (S.D.N.Y. 2010).  More recently, the Second Circuit has stated unequivocally that:

> Congress could easily have included "licensee" or "exclusive licensee" among the
> terms in 15 U.S.C. § 1127 that define a "registrant."  It chose instead to limit
> standing to parties having a more specific set of interests in the registered mark.
> A plaintiff therefore must show that its "license" amounts, in fact, to an
> assignment to establish entitlement to sue under Section 32(1).

*Fed. Treasury Enter. Sojuzplodoimport v. SPI Spirits Ltd.*, 726 F.3d 62, 78 (2d Cir. 2013).

[34]     A trademark license could also include a transfer where the debtor is the licensee and pays royalties under the license, but the transfer in question would be a transfer of money, rather than a transfer of rights.

the contract without justification"; (4) "actual breach of the
contract"; and (5) "damages resulting therefrom."

*Kirch v. Liberty Media Corp.*, 449 F.3d 388, 401 (2d Cir. 2006) (quoting *Lama Holding Co. v.

Smith Barney Inc.*, 668 N.E.2d 1370, 1375 (N.Y. 1996)).

For the following reasons, the Court finds that Mr. Katzoff and GFB cannot be liable for

a tortious interference claim because they were not strangers to the 2020 Amendment.

Additionally, the Court finds that Mr. Katzoff and GFB cannot be liable because of the

Plaintiff's failure to show actual damages.

### A.  New York's Stranger Rule

Before even examining the elements of a tortious interference claim, the Court first

considers whether the Plaintiffs can overcome New York's "stranger rule."  This rule holds that

"[a] claim for tortious interference with a contract must be based on a *non-party* improperly

interfering with a contract between two contracting parties, and cannot be based on the actions of

a director or officer in his official capacity."  *Rockland Exposition, Inc. v. All. of Auto. Serv.

Providers of N.J.*, 894 F. Supp. 2d 288, 336 (S.D.N.Y. 2012); *see also IMG Fragrance Brands,

LLC v. Houbigant, Inc.*, 679 F. Supp. 2d 395, 407 (S.D.N.Y. 2009) ("[T]he general rule is that a

claim for tortious interference will lie only against a stranger who improperly interferes with a

contract between two contracting parties."); *Solow v. Stone*, 994 F. Supp. 173, 182 (S.D.N.Y.

1998) (explaining that corporate administrators were "insiders" and not third parties to the

allegedly breached contract, and thus could not be held liable for tortious interference with

contract).  New York's stranger rule "is rooted in cases in which a corporation's officer or

director is sued as an individual for causing the corporation to breach a contract."  *Renaissance

Search Partners v. Renaissance Ltd., L.L.C.*, No. 12-CV-05638, 2014 WL 12770400, at *5

(S.D.N.Y. July 3, 2014), *report and recommendation adopted*, 2014 WL 4928945 (S.D.N.Y.

Oct. 1, 2014).  Thus, an LLC manager acting within the scope of his or her authority is not a third party to the LLC and as such cannot interfere with the LLC's own contract.  *See ConocoPhillips v. 261 East Merrick Rd. Corp.*, 428 F. Supp. 2d 111, 122 (E.D.N.Y. 2006); *Murtha v. Yonkers Child Care Ass'n, Inc.*, 383 N.E.2d 865 (N.Y. 1978) ("A director of a corporation is not personally liable to one who has contracted with the corporation on the theory of inducing a breach of contract, merely due to the fact that, while acting for the corporation, he has made decisions and taken steps that resulted in the corporation's promise being broken.").

However, there is a "narrow exception . . . for officers acting wholly outside the scope of their authority for purely personal gain" as well as the exception's "enhanced pleading standard" requiring allegations of malicious acts calculated to harm the plaintiff's business for the defendant's personal profit.  *Houbigant*, 679 F. Supp. 2d 395, 407–08; *Joan Hansen & Co., Inc. v. Everlast World's Boxing Headquarters Corp.*, 744 N.Y.S.2d 384, 390–91 (1st Dep't 2002). This exception requires that "the acts of the defendant corporate officers which resulted in the tortious interference with contract either were beyond the scope of their employment or, if not, were motivated by their personal gain, as distinguished from gain for the corporation." *Petkanas v. Kooyman*, 759 N.Y.S.2d 1, 2 (1st Dep't 2003).

Lastly, one is not a stranger to the contract, for purposes of a claim for tortious interference, just because one is not a party to the contract:  one also must be a stranger to the contractual relationship giving rise to and underpinning the contract at issue.  *See UBS Sec. LLC v. Highland Cap. Mgmt., L.P.*, 927 N.Y.S.2d 59, 66 (1st Dep't 2011) (finding the tortious interference claim failed where the defendant was not a stranger to the contractual relationship giving rise to and underpinning the contract at issue); *Castle Restoration, LLC v. Castle Restoration & Constr., Inc.*, 129 N.Y.S.3d 265, 265 (N.Y. Sup. Ct. 2020) ("Robert Castaldi was

the president of Castle Inc., and Diane Castaldi was its sole shareholder. As such, they were not strangers to the asset-sale agreement.").

1. Mr. Katzoff

To assert that Mr. Katzoff tortiously induced IM-I into executing the 2020 Amendment, the Plaintiffs must demonstrate that he was working outside his official capacity as a managing member of IM-I. While the tortious interference claim is brought under New York law, the parties dispute whether Delaware or New York law applies in determining whether Mr. Katzoff was working outside his capacity as managing member of IM-I when signing the 2020 Amendment. The Defendants persuasively contend that under either law, the result would be the same. In that case, the Court is not required to conduct a choice-of-law analysis, because the result is the same regardless of the law applied. *See Creazioni Artistiche Musicali, S.r.l. v. Carlin Am., Inc.*, 747 F. App'x 3, 5 (2d Cir. 2018).

Under Delaware law, "[l]imited liability companies are creatures of contract, and the parties have broad discretion to use an LLC agreement to define the character of the company and the rights and obligations of its members. . . . Accordingly, as with any contract, the Court must look to the language of the LLC Agreement to determine" the scope of the capacity of the Operating Manager. *See Kuroda v. SPJS Holdings, L.L.C.*, 971 A.2d 872, 880–81 (Del. Ch. 2009).

The analysis is no different under New York law. As stated by the Appellate Division, First Department:

> It is often said that LLCs are "creatures of contract," and that "[o]ne attraction of the LLC form of entity is the statutory freedom granted to members to shape, by contract, their own approach to common business relationship problems." Article IV of the New York LLC Act makes clear that the operating agreement of an LLC governs the relationships among members and the powers and authority of the members and manager.

58

*LNYC Loft, LLC v. Hudson Opportunity Fund I, LLC*, 57 N.Y.S.3d 479, 483 (1st Dep't 2017)

(citations omitted).

Thus, the Court refrains from conducting a choice of law analysis and instead will

consider both New York law and Delaware law in determining whether Mr. Katzoff was

working within his capacity as an LLC Manager.

IM-I's Operating Agreement sets the scope of authority for Mr. Katzoff as Operating

Manager. Section 5.4 of the IM-I Operating Agreement provides:

> The Company shall be managed by the Operating Manager and the
> conduct of the Company's business shall be controlled and
> conducted solely and exclusively by the Operating Manager in
> accordance with this Agreement. In addition to and not in limitation
> of any rights and powers conferred by law or other provisions of this
> Agreement, the Operating Manager shall have and may exercise on
> behalf of the Company all powers and rights necessary, proper,
> convenient or advisable to effectuate and carry out the purposes,
> business and objectives of the Company, and to maximize Company
> profits.

(Pls. Ex. 4 § 5.4.)

When executing the 2020 Amendment on behalf of IM-I, Mr. Katzoff was clearly acting

within the broad contractual capacity of Operating Manager. The record shows that when

drafting and executing the 2020 Amendment, Mr. Katzoff was acting in his capacity as a

corporate officer of both IM-I and GFB, as Mr. Katzoff is the president of GFB and operating

manager of IM-I. (Katzoff Test. at 3:12–13; 16–17.) Clearly, any actions taken by Mr. Katzoff

in connection with the 2020 Amendment were well within the scope of his corporate

representative capacities.

At trial, Mr. Katzoff denied that his actions in connection with the 2020 Amendment

were motivated to obtain personal gains, as opposed to benefit IM-I and GFB. (Transcript at

97:7–9.) Here, the only relevant inquiry is whether the Defendants had a legitimate profit-

seeking motive, not whether the there was an actual benefit.  Furthermore, Mr. Katzoff's

deposition states that the 2020 Amendment was made under the assumption to prepare the entire

entity for sale to someone new rather than BSP.  (Katzoff Depo. at 121:2–8.)  Mr. Katzoff also

states that the benefit in the transaction was "to keep the flagship Il Mulino at GFB open" and to

"let[] a buyer see that it's going to stay around for a long time."  (*Id*. at 121:9–20.)

In response, the Plaintiffs argue that Mr. Katzoff's statements are not credible, as any

buyer of the "entire entity" would have been able to freely grant sublicenses through the IM USA

license.  However, for the narrow exception to the stranger rule to apply, the Plaintiffs must meet

an enhanced pleading standard requiring allegations of malicious acts calculated to harm the

plaintiff's business for the defendant's personal profit.  *Houbigant*, 679 F. Supp. 2d 395, 407–08.

Yet, the Second Amended Complaint is full of conclusory allegations.  Of course, this decision is

reached after trial, not on a motion to dismiss the complaint.  To prevail on this claim Plaintiffs

were required to *prove* malicious acts calculated to harm the Plaintiffs' business for Mr.

Katzoff's personal profit, and this they failed to do.  The Plaintiffs have not pointed to specific

facts demonstrating that Mr. Katzoff acted with the requisite level of bad faith or malice needed

to prevail on this claim for tortious interference.  *See Castle Restoration, LLC*, 129 N.Y.S.3d at

265 (finding the conclusory allegations that defendants were personally motivated by a desire to

save themselves money insufficient to survive a motion for summary judgment where the record

did not reflect that the defendants' actions were performed with malice nor that they were

calculated to impair plaintiff's business for their personal profit).  In fact, the Plaintiffs'

Supplemental Brief did not assert that Mr. Katzoff was working outside the interests of IM-I; it

only states that Mr. Katzoff was working to the benefit of GFB and to the detriment of IM USA.

It is consistent to find that Mr. Katzoff was working to the benefit of GFB and to the benefit of

IM-I.  And the Plaintiffs' contention that Mr. Katzoff was working outside the interests of IM

USA is irrelevant to showing that Mr. Katzoff intentionally procured IM-I's breach.

This Court will not second guess Mr. Katzoff's purported motives and business

judgment.  If genuine, Mr. Katzoff's purported reasons for engaging in the 2020 Amendment

constitute a legitimate profit-seeking activity of the affiliated enterprise.  *See MTI/The Image*

*Grp.*, 690 N.Y.S.2d 576 (1st Dep't 1999) ("[S]ince all named companies are affiliated with

defendant, either as parent or sister companies, and thus had economic interest, plaintiff failed to

demonstrate malice, and corporate agents who allegedly committed tort were simultaneously

acting as agents (in negotiating and executing contracts) of defendant, signatory to contracts.");

*Shearin v. E.F. Hutton Group, Inc.*, 652 A.2d 578, 591 (Del. Ch. 1994) (defendant was justified

in pursuing "in good faith the legitimate profit seeking activities of [its] affiliated enterprise[]"

that was a party to the contract).  And, as already explained above, the Plaintiffs have not

demonstrated that any acts by the Defendants are inherently wrongful.  As a managing member

of IM-I, Mr. Katzoff was entitled to breach the IM-III License on behalf of IM-I.

Accordingly, under either Delaware law or New York law, the tortious interference claim

against Mr. Katzoff plainly fails.

### 2.  GFB

As for GFB, the Plaintiffs have also failed to show that GFB is a stranger to the IM-III

License.  There is no dispute that GFB is an affiliate of IM-I.  The Plaintiffs contend that while

GFB is an affiliate of IM-I, GFB can be held liable for inducing the breach of the IM-III License

because it is a third party to the IM-III License between IM-I and IM-III (as assigned to IM

USA).  However, the Plaintiffs provide no facts to show that GFB was indeed a stranger to the

contractual relationship giving rise to and underpinning the IM-III License.

The Defendants' argument that GFB cannot be liable for tortious interference as an affiliate is persuasive. *MTI/The Image Grp.*, 690 N.Y.S.2d at 579 ("It was also error not to dismiss the third cause of action, for tortious interference with contractual relations and prospective economic advantage, since all the named companies are affiliated with [the party to the contract.]"); *Koret, Inc. v. Christian Dior, S.A.*, 554 N.Y.S.2d 867, 869 (1st Dep't 1990) (citing *Felsen v. Sol Cafe Mfg. Corp.*, 249 N.E.2d 459 (N.Y. 1969)) (stating that a company "ha[s] a right to interfere with the contract of its subsidiary in order to protect its economic interests"). Like in *Koret*, "[GFB] was no stranger to the [IM-III License], in view of the fact that Mr. [Katzoff], who was both managing [IM USA with Mr. Galligan] and [president] of [GFB], played a role in negotiation of the [IM-III License] and executed same." *Koret*, 554 N.Y.S.2d at 869. Furthermore, as stated above, the Plaintiffs have failed to show that Mr. Katzoff was not acting in furtherance of the shared legitimate business interests on behalf of GFB and IM-I.[35]

---

[35]    As explained by the Delaware Court of Chancery:

> Delaware law . . . shields companies affiliated through common ownership from tortious interference with contract claims when the companies act in furtherance of their shared legitimate business interests. In [*Shearin*], Chancellor Allen noted that other cases had applied the affiliate privilege to situations where a parent allegedly tortiously interfered with a subsidiary's contract and held that the privilege also applied to discussions between wholly owned affiliates with a common parent. The court based its ruling, in part, on the fact that "[s]uch entities share a commonality of economic interests which underlay the creation of an interference privilege." To overcome the affiliate privilege, a plaintiff must adequately plead that the defendant "was motivated by some malicious or other bad faith purpose." 652 A.2d at 591. As explained in *Allied Capital Corp. v. GCSun Holdings, L.P.*, 910 A.2d 1020, 1039 (Del. Ch. 2006):
>
> > Chancellor Allen [in *Shearin*] acknowledged that the test for holding a parent corporation liable for tortious interference had to be high or every-day consultation or direction between parent corporations and subsidiaries about contractual implementation would lead parents to be always brought into breach of contract cases. He also feared that the option of efficient breach—the conscious decision to breach a contract and pay the required damages because of the potential for profit even after the payment of those damages—would be chilled by holding the

Accordingly, the Plaintiffs' claim for tortious interference against GFB also fails.

## B. Damages

Even if the Plaintiffs could overcome New York's stranger rule, the Court finds that Mr. Katzoff and GFB cannot be liable for tortious interference because no damages resulted from the underlying breach. *See Kronos, Inc. v. AVX Corp.*, 612 N.E.2d 289, 294 (N.Y. 1993) ("To summarize, no cause of action for tortious inducement to breach a contract arises until actual damages are sustained; nominal damages associated with the underlying breach of contract will not stand in the stead of actual damages; and, finally, no inference of actual damages is implicit by the facts alleged in the amended complaint."). IM-I and GFB rescinded the 2020 Amendment in its entirety on May 24, 2021. (2021 Amendment.) The Plaintiffs have not shown and cannot show any damages from the 2020 Amendment, which was never acted upon, and was subsequently rescinded.

The only argument left for the Plaintiffs is that the 2020 Amendment "damaged IM USA by infringing upon its exclusive license, and if reinstated, would make it difficult for Plaintiffs to profitably manage their restaurants and market the enterprise to a potential buyer." (Pls. Br. at 86.) The Plaintiffs have failed to show actual damages resulting from the breach of the IM-III License and are attempting to improperly bootstrap damages that might have been available for their abandoned trademark infringement claim.

Accordingly, the Plaintiffs' claim for tortious interference against Mr. Katzoff and GFB fails.

---

parent responsible in tort. For these reasons, Chancellor Allen indicated that plaintiffs could only hold a parent corporation liable for tortious interference under a stringent bad faith standard.

*James Cable, LLC v. Millennium Digit. Media Sys., L.L.C.*, No. 3637-VCL, 2009 WL 1638634, at *4 (Del. Ch. June 11, 2009) (footnotes omitted).

## X.   COUNT IX: FRAUD

The Plaintiffs have dropped this claim.  (Joint Pretrial Order at 9 n.2.)

## XI.   COUNT X: BREACH OF FIDUCIARY DUTY

The Plaintiffs allege that, by executing the 2020 GFB License Amendment on behalf of

IM-I and GFB, Mr. Katzoff breached fiduciary duties that he owed to IM USA.[36]  (Joint Pretrial

Order at 9.)  Specifically, the Plaintiffs allege that "[t]he 2020 GFB License Agreement stripped

IM USA of certain value of the [IM-III License], and benefitted GFB, and ultimately Mr.

Katzoff, who orchestrated the transaction to benefit himself and entities he controlled while

diminishing the value of IM USA's assets."  (SAC ¶ 216.)  The Plaintiffs seek only nominal

damages with respect to this cause of action.  (*See* Pls. Supp. at 57.)

Under Delaware law, a breach of fiduciary duty claim has two elements: "a plaintiff must

demonstrate that the defendant owed [the plaintiff] a fiduciary duty and that the defendant

breached it."  *Estate of Eller v. Bartron*, 31 A.3d 895, 897 (Del. 2011).  Damages, however, are

not a required element of a breach of fiduciary duty claim under Delaware law.  *See, e.g.*,

*Ravenswood Inv. Co., L.P. v. Estate of Winmill*, C.A. No. 3730-VCS, C.A. No. 7048-VCS, 2018

WL 1410860 at *27 (Del. Ch. Mar. 21, 2018) (awarding plaintiff nominal damages on breach of

duty of loyalty claim).

The Defendants contend that damages are also a required element of this claim (Defs. Br.

at 42), but that is true only if New York law applies.  *See Pokoik v. Pokoik*, 928 N.Y.S.2d 67, 70

(1st Dep't 2014) ("To establish a breach of fiduciary duty, the movant must prove the existence

---

[36]      While the Plaintiffs initially alleged that Mr. Katzoff also breached duties to K.G. IM (SAC ¶ 219), and that K.G. IM breached duties that it owed to IM USA (*id.* ¶ 218), those allegations do not appear in the Joint Pretrial Order, which only contains allegations that Mr. Katzoff breached fiduciary duties that he owed to IM USA.  (Joint Pretrial Order at 9.)

of a fiduciary relationship, misconduct by the other party, and damages directly caused by that

party's misconduct.").

"Generally, New York law requires that claims related to corporate affairs . . . are

governed by the internal affairs doctrine." *In re BP p.l.c. Derivative Litig.*, 507 F. Supp. 2d 302,

307 (S.D.N.Y. 2007). As explained by the Supreme Court:

> The internal affairs doctrine is a conflict of laws principle which
> recognizes that only one State should have the authority to regulate
> a corporation's internal affairs—matters peculiar to the relationships
> among or between the corporation and its current officers, directors,
> and shareholders—because otherwise a corporation could be faced
> with conflicting demands.

*Edgar v. Mite Corp.*, 457 U.S. 624, 645 (1982). Breach of fiduciary duty claims are related to

corporate affairs and are therefore governed by the internal affairs doctrine. *See, e.g.*, *Hausman*

*v. Buckley*, 299 F.2d 696, 703 (2d Cir. 1962) ("[T]he 'internal affairs' rule has been applied

repeatedly in order to determine the fiduciary duty of a foreign corporation's directors."); *Sama*

*v. Mullaney (In re Wonderwork, Inc.)*, 611 B.R. 169, 194 (Bankr. S.D.N.Y. 2020) ("The Debtor

was incorporated under Delaware law and claims for breach of fiduciary duty are governed by

Delaware law under the internal affairs doctrine.").

IM USA and K.G. IM are both LLCs organized under the laws of Delaware. (*See* "IM

USA Operating Agreement," Pls. Ex. 17, at 4; "K.G. IM Operating Agreement," Case No. 20-

11723, ECF Doc. # 20-20, at 2.) Delaware law therefore applies to the Plaintiffs' breach of

fiduciary duty claim. And fiduciary duties do apply in the context of an LLC. *See* DEL. CODE

ANN. tit. 6, § 18-1104 (2021) ("In any case not provided for in this chapter, the rules of law and

equity, including the rules of law and equity relating to fiduciary duties . . . shall govern."); *see*

*also CSH Theatres, LLC v. Nederlander of San Francisco Assocs.*, C.A. No. 9380-VCP, 2015

WL 1839684, at *11 (Del. Ch. Apr. 21, 2015) ("In the absence of language in an LLC agreement

to the contrary, the managers of an LLC owe traditional duties of care and loyalty."). The

Delaware Limited Liability Company Act provides that such duties may, however, be displaced

by express language to the contrary in an LLC's operating agreement:

> To the extent that, at law or in equity, a member or manager or other person has duties (including fiduciary duties) to a limited liability company or to another member or manager or to another person that is a party to or is otherwise bound by a limited liability company agreement, the member's or manager's or other person's duties may be expanded or restricted or eliminated by provisions in the limited liability company agreement; provided, that the limited liability company agreement may not eliminate the implied contractual covenant of good faith and fair dealing.

DEL. CODE ANN. tit. 6, § 18-1101(c) (2021). Language that eliminates fiduciary duties must be

clear and unambiguous. *See Ross Holding & Mgmt. Co. v. Advance Realty Grp.,* LLC, No.

4113-VCN, 2014 WL 4374261, at *15 (Del. Ch. Sept. 4, 2014) ("Although fiduciary duties may

be disclaimed, agreements' drafters must do so clearly, and should not be incentivized to

obfuscate or surprise investors by ambiguously stripping away the protections investors would

ordinarily receive."). Thus, the Plaintiffs may assert a claim for breach of fiduciary duty under

Delaware law, but only to the extent that the operating agreements of IM USA and K.G. IM

permit such a claim.

Neither the IM USA Operating Agreement nor the K.G. IM Operating Agreement

expressly eliminates fiduciary duties. Article VIII, Section 8.01 of the IM USA Operating

Agreement provides, *inter alia*:

> (b) To the extent that, at law or in equity, any Indemnified Person[37] has duties or is deemed to have duties (including fiduciary duties) and liabilities relating thereto to the Company or to any Member, the Manager and any other Indemnified Person acting in connection with this Agreement or the Company's business or affairs shall not

---

37       The IM USA Operating Agreement defines "Indemnified Person" as "the Manager and its members, directors. [sic] officers, employees, representatives, agents and Affiliates." (IM USA Operating Agreement, Appendix A.) It defines the "Manager" as K.G I.M, LLC. (*Id.*)

> be liable to the Company or to any Member for its good faith
> reliance on the provisions of this Agreement or any approval or
> authorization granted by the Members.  The provisions of this
> Agreement, to the extent that they restrict the duties and liabilities
> of any Indemnified Person otherwise existing at law or in equity, are
> agreed by the Members to replace such other duties and liabilities of
> such Indemnified Person.

(IM USA Operating Agreement § 8.10(b).)  Thus, the IM USA Operating Agreement borrows

some of the precise language of the Delaware statute ("To the extent that, at law or in equity, a

member or manager or other person has duties (including fiduciary duties) to a limited liability

company or to another member or manager"), but the IM USA Operating Agreement does not

explicitly eliminate duties.  On the contrary, it recognizes that an Indemnified Person may have,

or be deemed to have, fiduciary duties.  The IM USA Operating Agreement limits the liability of

an Indemnified Person, including K.G. IM, based on that Indemnified Person's good faith

reliance on provisions of the IM USA Operating Agreement, but it does not eliminate fiduciary

duties altogether.  Similarly, the K.G. IM Operating Agreement contains provisions on

exculpation and indemnification, but it does not make any explicit reference to fiduciary duties

and certainly does not clearly and unambiguously eliminate them.  (*See* K.G. IM Operating

Agreement Art. 4.)  Delaware's default fiduciaries duties remained applicable to K.G. IM and IM

USA when Mr. Katzoff executed the 2020 Amendment, and Mr. Katzoff owed a duty to K.G.

IM, which in turn owed a duty to IM USA.  Thus, to the extent that Mr. Katzoff's duties flowed

directly to IM USA, he is liable for breaches of fiduciary duty as to IM USA.

For the proposition that they are entitled to relief based on a theory of "second-tier

controller" fiduciary liability—as Mr. Katzoff was the manager of K.G. IM, which was the

manager of IM USA—the Plaintiffs cite *In re USACafes, L.P. Litigation*, 600 A.2d 43 (Del. Ch.

1991).  (Pls. Br. at 83.)  However, the Plaintiffs here have failed to prove that the *USACafes*

doctrine is satisfied here.  In *USACafes*, the plaintiffs were holders of limited partnership

67

interests, and the defendants were individual directors of the corporate general partner of the limited partnership in which the plaintiffs were investors. *USACafes*, 600 A.2d at 45. The plaintiffs alleged breaches of the duty of loyalty by the general partner's directors based on receipt of side payments in connection with the sale of the partnership to a third-party buyer. *Id.* at 46. In denying the individual directors' motion to dismiss, the Delaware Court of Chancery found that "the assertion by the directors that the independent existence of the corporate General Partner is inconsistent with their owing fiduciary duties directly to the limited partners [was] incorrect." *Id.* at 48. The court specifically envisioned such liability in the context of a "classic self-dealing transaction," e.g., a situation in which "a majority of the board of the corporate general partner formed a new entity and then caused the general partner to sell partnership assets to the new entity at an unfairly small price, injuring the partnership and the limited partners." *Id.* at 49. The court reasoned that the duty of a second-tier controller "surely entails the duty not to use control over the partnership's property to advantage the corporate director at the expense of the partnership." *Id.*

That same language from *USACafes*—"the duty not to use control over the partnership's property to advantage the corporate director at the expense of the partnership"—was later adopted by then-Vice Chancellor Strine in *Bay Center Apartments Owner, LLC v. Emery Bay PKI, LLC*, C.A. No. 3658-VCS, 2009 WL 1124451 (Del. Ch. Apr. 20, 2009), when applying the *USACafes* theory of second-tier liability in the LLC context.[38] Acknowledging that "*USACafes* does not apply to all affiliates in all circumstances," the court then set out to determine the proper breadth of *USACafes*-style liability:

---

[38]     The court noted, however, that the defendants in *Bay Center* did "not challenge the general applicability of [the *USACafes*] doctrine in the LLC context." *Bay Center*, 2009 WL 1124451 at *9.

> First, to have any fiduciary duties to an entity, the affiliate must exert
> control over the assets of that entity. . . .  Second, *USACafes* suggests
> that controlling affiliates do not have the full range of traditional
> fiduciary duties, although that case specifically disclaims any effort
> to fully delineate the scope of controlling affiliate duties.

*Id.* at *9.  In seeking to delineate the scope of such duties, the court reasoned that "[l]imiting the application of *USACafes* to this duty [the duty not to use control over the first-tier entity's property to advantage the second-tier manager at the expense of the first-tier entity] provides . . . a rational and disciplined way of protecting investors in alternative entities with managing members who are themselves entities, while not subjecting all the individuals who work for managing members to wide-ranging causes of action."  *Id.* at *10.  Thus, the court concluded, it was necessary for a plaintiff to plead that an individual second-tier controller had "benefited himself at the expense of [the first-tier, LLC-managed LLC] in order to withstand [a] motion to dismiss."  *Id.*

While *USACafes* can no doubt be a powerful tool for plaintiffs under appropriate circumstances, the *USACafes* doctrine is a narrow one, which "recognizes [that] remote controllers . . . will owe *limited* fiduciary duties *if* they 'exert control over the assets of that entity.'"  *77 Charters, Inc. v. Gould*, C.A. No. 2019-0127-JRS, 2020 WL 2520272, at *9 (Del. Ch. May 18, 2020) (quoting *Bay Ctr.*, 2009 WL 1124451 at *9–10).[39]

---

[39]    The *USACafes* doctrine may be further limited by a requirement that a plaintiff show a breach of duty on the part of the managing entity in order to establish liability for the manager of that entity, although this is not entirely clear from the Delaware caselaw.  *See Gotham Partners, L.P. v. Hallwood Realty Partners, L.P.*, 795 A.2d 1, 34 (Del. Ch. 2001) (Strine, V.C.) ("I agree with the defendants that [the corporate owner of a corporate general partner] and [the directors of the corporate owner of the general partner] cannot be held liable for breach of fiduciary duty in a situation where the General Partner, because of its compliance with a contractual safe harbor, does not owe such liability."), *aff'd in part, rev'd in part*, 817 A.2d 160 (Del. 2002).  It is thus unclear whether the intermediary entity must generally owe such liability itself or whether the *Gotham Partners* court was merely declining to impose third-tier controller liability.  However, it is not necessary to settle that question in this instance, as there is an independent basis on which to conclude that there was no breach of fiduciary duty by Mr. Katzoff.

Notwithstanding the limits of the *USACafes* doctrine, it is clear under Delaware law that, where the individual manager (e.g., Katzoff) of an LLC (e.g., K.G. IM), which is itself the manager of another LLC (e.g., IM USA), exerts control over the property of the LLC-managed entity at the expense of the LLC-managed entity, the individual manager can be liable for breaches of the duty of loyalty. While the result of the 2020 Amendment—if Mr. Katzoff had acted upon it, and if he not rescinded it—may have been to benefit Mr. Katzoff (by way of GFB, of which he was and remains a beneficial owner) at the expense of IM USA,[40] the execution of the 2020 Amendment was not an exercise of control over IM USA's property. The 2020 Amendment was an amendment of the *GFB License*, executed by Mr. Katzoff on behalf of *IM-I* and *GFB*. While there may have been some *effect* on IM USA's property (i.e., IM USA's rights under the IM-III License may have been stripped of some value, as the Plaintiffs allege),[41] Mr. Katzoff did not exert *control* over that property in executing the 2020 Amendment, as would be required for a finding of *USACafes*-style liability. This is not to say the Mr. Katzoff's treatment of the various entities that were under his care deserves praise. But, as noted above, this is a narrow doctrine, and the Plaintiffs have failed to prove that it is satisfied in this instance.

Accordingly, the Plaintiffs are not entitled to a judgment in their favor on Count X.

---

[40]     Whether Mr. Katzoff personally benefited from the 2020 Amendment is far from certain for at least two reasons. First, Mr. Katzoff owned a larger share in K.G. IM/IM USA than he did in GFB, making any transfer in value (if indeed there was one) from the K.G. IM/IM USA entity group to GFB detrimental to Mr. Katzoff, at least in theory. Second, Mr. Katzoff had personally guaranteed IM USA's debts to BSP (Pls. Ex. 100), so any decrease in IM USA's value could have led to a corresponding increase in Mr. Katzoff's personal liability on his guarantee.

[41]     Whether the 2020 Amendment stripped value from IM USA's rights under the IM-III License is also unclear. IM-I's execution of the 2020 Amendment was clearly a breach of the promise of exclusivity in Section 1.1 of the IM-III License, but a breach of the promise of exclusivity does not turn an exclusive right into a non-exclusive right. IM USA still had exclusive rights to use the Intellectual Property under the IM-III License and could sue to enforce those rights; it did not lose those rights due to the breach.

## XII.  <u>DEFENDANTS' COUNTERCLAIMS</u>

### A.  Counterclaim for a Declaration that the GFB License Is Valid

Defendants' first counterclaim is for a declaration that the GFB License is valid.  The two "issues to be tried" listed in the Joint Pretrial Order with respect to this counterclaim are as follows:

  a.  Whether the GFB License breaches the IM USA License;

  b.  Whether the IM USA License recognizes and allows for the existence of the GFB License.

(Joint Pretrial Order at 9.)

For the reasons stated above, the Court concludes that the GFB License and the IM-III License do not overlap.  Accordingly, the GFB License does not breach the IM-III License, and the IM-III License allows for the existence of the GFB License.

The Court also concludes that it is unnecessary to determine whether the IM-III License "recognizes" the GFB License.  The IM-III License and the GFB License deal with distinct uses of the Intellectual Property; it is not necessary for the IM-III License to have acknowledged the GFB License for the two licenses not to overlap.

### B.  Counterclaim for Breach of Section 3.1.1 of the IM-III License

Defendants' second counterclaim is for breach of the IM-III License.  The Defendants argue that the Plaintiffs breached Section 3.1.1 by bringing infringement claims against the Defendants, and challenging the Defendants' rights in the Intellectual Property.  (Defs. Br. at 33–34.)  The Defendants seek rescission or termination of the IM-III License because of the alleged breach.

Section 3.1.1 provides:

> 3.1 <u>Ownership of the Intellectual Property.</u>
>
>> 3.1.1.  Licensee acknowledges and agrees that Licensor is the owner of all right, title and interest in and to the Intellectual Property, including all related trademark registrations and applications for registration and all "il mulino" formative domain names, even if registered to Licensee, and substantially similar domain names, even if registered to Licensee, and retains all rights therein except as g ranted herein, and that no such right, title or interest therein is conveyed hereby.  Licensee shall not challenge or, directly or indirectly, assert any right, title or interest in or to the Intellectual Property or any "il mulino" formative trademark applications for registration or registration thereof or any "il mulino" formative domain names or substantially similar domain names.  Licensee shall not use or permit others to use the Intellectual Property or an "il mulino" formative trademark, company name, domain name or a substantially similar trademark, company name or domain name in any way inconsistent with Licensor's rights therein and all uses of the Intellectual Property shall inure to the benefit of Licensor.

(IM-III License § 3.1.)

The Plaintiffs respond that they have not breached Section 3.1.1, as they concede that

IM-I, and not the Plaintiffs, own the Intellectual Property.  (Pls. Br. at 95–96; Pls. Reply at 29.)[42]

---

[42]    As noted above, this seems inconsistent with the Plaintiffs' other statements that

> trial will show that all expenses for maintenance and upkeep of the websites and social media, including compensation for the employees and consultants who worked on them, was paid by IM USA.  As a result, Debtor IM USA was the registrant and record owner of each of the Il Mulino Websites, corresponding Email Accounts, and Social Media Accounts.

> Pursuant to the APA, BSP also acquired "all of the Sellers' telephone numbers, fax numbers, e-mail addresses, websites, URLs and internet domain names related to the Business."  APA § 2.1(x).  Accordingly, Plaintiffs acquired the Il Mulino Websites, Email Accounts, and Social Media Accounts, and are entitled to an order requiring Defendants to transition control of the these [sic] assets.  *See, e.g.*, *Tiffany (NJ) LLC v. Dong*, 11 Civ. 2183 (GBD) (FM), at *19 (S.D.N.Y. Aug. 9, 2013) (granting permanent injunction "compelling the Seller Defendants to transfer to [Plaintiff] the registrations of the infringing websites' domain names").

(Pls. Br. at 87–88.)

In addition, the IM-III License explicitly provides the authority for the licensee to bring an infringement action if the appropriate measures are taken.  (*See* IM-III License § 3.3.)  It would be illogical for the initiation of an infringement action, as authorized by Section 3.3, to constitute a breach of Section 3.1.1.  Accordingly, the Court concludes that the Plaintiffs have not breached Section 3.1.1.

The Plaintiffs also argue that, even if they had breached Section 3.1.1, this would not be grounds for termination of the contract.  The Plaintiffs point to Section 6.2, which provides:

> 6.2.    Termination for Breach:  Upon written notice from Licensor to Licensee, Licensor may terminate this Agreement and all rights granted herein if Licensee materially breaches Section 4.2 of this Agreement, which has a material adverse effect on Licensor, and Licensee fails to cure such breach, if curable, within thirty (30) business days after receiving written notice of such breach from Licensor.

(IM-III License § 6.2.)  The Plaintiffs argue that the *only* grounds for termination are those stated in Section 6.2.

Contrary to the Plaintiffs' position, Section 6.2 does not state that it is an exhaustive list of all the grounds for termination; it does not say that "Licensor may terminate this Agreement and all rights granted herein *only* if Licensee materially breaches Section 4.2."  "Under New York law, when one party has committed a material breach of a contract, the non-breaching party is discharged from performing any further obligations under the contract, and the non-breaching party may elect to terminate the contract and sue for damages."  *NAS Elecs., Inc. v. Transtech Elecs. Pte Ltd.*, 262 F. Supp. 2d 134, 145 (S.D.N.Y. 2003).  The Second Circuit has described a "material breach" under New York law as follows:

> Under New York law, for a breach of a contract to be material, it must "go to the root of the agreement between the parties."  A party's obligation to perform under a contract is only excused where the other party's breach of the contract is so substantial that it defeats the object of the parties in making the contract.

*Frank Felix Assocs., Ltd. v. Austin Drugs, Inc.*, 111 F.3d 284, 289 (2d Cir. 1997) (quoting

*Septembertide*, 884 F.2d at 678).

      In another case, the Second Circuit has cast doubt on the possibility of a contract limiting

the equitable remedy of rescission:

> it seems to us unlikely that parties to a contract may, as a matter of
> law, contractually limit a buyer's right to the equitable remedy of
> rescission. . . .  [I]nsofar as the effect of rescission is to declare a
> contract void from its inception, it would be odd at best to allow the
> availability of this remedy to be curtailed by the very contract that
> the plaintiff seeks to rescind.

*Pyskaty v. Wide World of Cars, LLC*, 856 F.3d 216, 229 (2d Cir. 2017) (internal quotation marks

and citations omitted).

      However, the Second Circuit also noted:

> Under New York law, a plaintiff may obtain rescission—in lieu of
> actual damages—when a breach of contract is either material and
> willful or so substantial and fundamental that it strongly tends to
> defeat the purpose of the contract.  Because it is an equitable
> remedy, rescission is available only if damages would not be a
> complete and adequate remedy and the status quo may be
> substantially restored by equitable relief.

*Id.* at 227 (internal quotation marks and citations omitted).

      Even if there were a breach of Section 3.1.1, the Defendants have not proven that the

breach of Section 3.1.1 "goes to the root of" the contract or is "so substantial and fundamental

that it strongly tends to defeat the purpose of the contract."  Accordingly, even if a breach of

Section 3.1.1 occurred, it would not be a material breach, and the Defendants would not be

entitled to termination or rescission.

74

## XIII.  **CONCLUSION**

For the reasons stated above, the Court finds that the licenses do not conflict with each other, and the licenses can coexist.  While the Court finds two breaches of the IM-III License, the Plaintiffs are entitled to only nominal damages.

With respect to the Plaintiffs' other claims, the Court concludes that the Post-Closing Letters did not violate the CRO Order but did violate the Sale Order (but the Plaintiffs are not entitled to attorneys' fees), and the claims for fraudulent transfer, tortious interference, and breach of fiduciary duty all fail.

As nominal damages for the breaches of the IM-III License, the Court awards Plaintiffs $2.00.

Plaintiffs' counsel shall settle a judgment consistent with this opinion in accordance with Local Bankruptcy Rule 9074-1.

**IT IS SO ORDERED.**

Dated:     August 12, 2021
           New York, New York

_Martin Glenn_
MARTIN GLENN
United States Bankruptcy Judge